# Wytheville.

## N. K. WHITE AND ALS. v. STUART, BUCHANAN & CO.

### July 27, 1882.

1. JOINT TENANTS—*Rents and profits.*—Occupying tenant is liable to their excluded co-tenants, for a reasonable rent for the common property in the condition it was when he took possession. Such is the rule in *Early and Wife* v. *Friend and als.*, 16 Gratt. 21, which overruled the English doctrine. He is not accountable for issues and profits actually made by the application of his labor, skill, and capital to the common property.

2. IDEM.—In ascertaining what is reasonable rent, where the report of the master is concurred in by court below, this court will not reverse except in case of palpable error.

3. IDEM—*Abatement.*—In absence of express covenant to pay rent, tenant is not liable for same, where the premises are destroyed—whatever the rule may be in case of such express covenant.

4. IDEM—*Case at bar.*—S B & Co. being joint tenants of King's Salt Works with the representatives of J W, deceased, and in possession under an expired lease, held over, without consent of those representatives, from 1st January, 1861, until 1st January, 1869. Under decree to ascertain what would be a reasonable annual rent for S B & Co. to pay those representatives, during that period under the circumstances, and what payments they have made thereon, and to compel S B & Co. to pay them their proper portion thereof, there was a report of the master to whom the cause was referred, to which both parties filed exceptions, and from the decree of the court below thereon, there was an appeal to this court.

HELD:

1. Had King's Salt Works been rented out in 1860 in anticipation of the expiration of the lease to P, it would have been for five years from 1st January, 1861, and none could have anticipated the extraordinary demand for salt resulting from the effectual blockade of the southern ports; and it is safe to say that the yearly rent would not have exceeded that stipulated for in the previous leases. After 1862, no renting could have been effected, except for Confederate money. S B & Co. doubtless reaped large profits from

the employment of labor, skill and capital in the business, and from sagacious investment of Confederate money. Their co-tenants, though excluded from the common property, have no right to share in those profits, but only a right to their proportion of what would be a fair yearly rent for that property in the condition wherein it was when S B & Co. took possession thereof. In view of these facts and principles, the plan of settlement whereby the judge of the court below has worked out a very difficult problem, though it may not attain complete justice, seems freer from objection than any other which has been suggested.

2. That the circumstances disclosed by the record, evince that the rent for the year 1861 has been satisfied by S B & Co.

3. That no extraordinary depreciation of the currency or changes of value having taken place in 1862, the best rule for ascertaining a reasonable rent for that year is to take the *ante-bellum* rent of $22,000, and allow a rent exceeding that sum in the same propor tion in which the production of 1862 exceeded the *ante-bellum* production ; which plan gives $66,000 rent for that year.

4. This rule not being suitable for the years 1863 and 1864, for those years the best plan is to take the annual rent of $300,000 in Confederate money, paid by the State for the use of five hundred kettles as the basis of calculation—which will give as the amount of rent a sum exceeding $300,000 in Confederate money, as the number of kettles exceeded five hundred ; that is, $86,000.

5. That from the destruction in December, 1864, of the salt works by the Federal forces, until the repair thereof, the rent should be abated.

6. That for 1866, in the state of things then existing, the *ante-bellum* rent of $22,000 would appear to be reasonable.

7. That for 1867 and 1868, the fairest test of rental value is the sum for which the property was rented in the fall of 1868, viz : $31,200.

5. CONSTRUCTION OF CONTRACT.—W R, with others, in September, 1858, executed an instrument agreeing to unite with P in leasing King's salt works *to the extent of their interests*, for a term of ten years. Accordingly, in October, 1858, P executed the lease to S P & Co. W R owned one-ninth of the King estate, and claimed one forty-eighth thereof acquired by purchase, and commonly known as the "Allen interest," and then in litigation, afterwards decided favorably to his claim.

HELD :

The lease to S A & Co. embraced W R's "Allen interest" as well as his other interest in the said King estate.

Appeal from decrees of the circuit court of Washington county, pronounced 18th October, 1877, and 17th February, 1879, respectively, in the two cases heard together of Stuart, Buchanan & Co., plaintiffs, against N. K. White and *als.*, defendants, *and* John D. Mitchell and *als.*, plaintiffs, against Alexander McCall and *als.*, defendants. The defendants in the first styled cause, to-wit: Newton K. White, Milton White, Addison White, Thomas W. White, Ann Eliza Pope, William Y. C. White, executor of Miss Eleanor White, deceased, James L. White, Ellen S. Campbell, Sue P. Trigg, James W. Ogden, J. G. Ogden, Lonny W. Humes and Newton McK. Humes, obtained an appeal to this court.

The facts and proceedings are indicated in the *syllabus* and fully stated in the opinion of the court. This is the sequel to the cause of *Stuart, Buchanan & Co.* v. *White and als.*, and *Mitchell and als.* v. *McCall and als.*, reported in 25 Gratt. 300.

*A. C. Cummings* and *John A. Campbell*, for the appellants.

*John W. Johnston* and *Terry & Pierce*, for appellees.

STAPLES, J., delivered the opinion of the court.

The first appeal in this case was taken by White's heirs from the decree of the 18th October, 1877, and from the decree of the 17th February, 1879. The second, a cross-appeal, was taken by Stuart and Palmer from the decree of the 17th February, 1879, and the third by Wyndham Robertson from the decree of January, 1880.

The questions arising under these appeals will now be considered in their regular order.

It may be proper to premise that there are two large coterminous estates, each containing valuable salt wells, lying

in Smyth and Washington counties.   One of these estates, that in Smyth, formerly belonged to Thomas L. Preston, and by his trustee was sold and conveyed to Stuart, Buchanan & Co.   The other estate, known as "King's Salt Works," was owned by a number of tenants in common among them, the heirs of James White, who were entitled to an interest of seven forty-eights acquired by purchase. Thomas L. Preston was also entitled to an interest of one-seventh in the same property.   It seems that many years ago the two estates were sometimes worked by a single tenant under separate leases from the different properties, sometimes separately by different tenants, and not unfrequently any of the owners of the King estate who were inclined so to do entered therein and exercised the privilege of making salt, as their inclination or necessities suggested. This condition of things proving extremely detrimental to all concerned, a bill was filed in the circuit court of Washington for the purpose or having the "King estate" rented out by a receiver.   This was finally done, and the property was leased to Wyndham Robertson for five years, commencing the 1st of January, 1851, at an annual rent of $16,000.   Upon the termination of this lease Thomas L. Preston became the lessee for five years, commencing the 1st of January, 1856, at an annual rent of $22,000.   Preston being thus the owner of the Preston Salt Works, the lessee of the King Salt Works, and having also an interest of one-seventh in the latter, in the year 1858 executed to Spencer, Ackerman & Co. a lease of both estates, at an annual rent of $30,000 for the Preston estate and $20,000 for the King estate.   This lease was made with the approbation of a portion of the heirs and representatives of James White, deceased.   It was, of course, invalid as to those who had not given their consent to it, so far as it extended beyond the 1st January, 1861.   Stuart, Buchanan & Co., who had become the owners of the Ackerman lease, continued in

the exclusive possession of the King Salt Works, operating the same in connection with the Preston estate from the year 1861 to 1868, inclusive. After the termination of the Ackerman lease, a protracted controversy arose between them and the appellants, White's heirs, who had not united in the Ackerman lease, touching the liability of Stuart, Buchanan & Co. for a just share or proportion of the rent for the years mentioned.

Under the decree of the district court, it was left to the circuit court of Washington county to determine whether it would confirm the Ackerman lease or treat Stuart, Buchanan & Co. as being in possession of the property under the terms of the Preston lease, or whether it would hold them liable for such other reasonable rent as the court should deem to be right. The circuit court, discarding the first two modes suggested, adopted the third, and determined that S., B. & Co. should be held accountable for a reasonable rent of the premises. This court, upon an appeal taken, affirmed that decree, thus recognizing the correctness of the rule laid down by the court for ascertaining the liability of the occupying tenants. The accounts were accordingly referred to a commissioner, who made two reports, each of which was excepted to by both parties. Some of these exceptions were sustained and others were overruled by the circuit court, and a decree was there entered in favor of White's heirs, which, however, it seems was not satisfactory to either party. It is conceded by all that the case is one of very great difficulty, involving many perplexing and embarrassing questions. The chief difficulty grows out of the want of some reliable data or basis for ascertaining what constitutes a reasonable rent for the use and occupation of the King Salt Works during the greater part of the war.

After the most careful examination, I am satisfied that no conclusion will ever be reached by any court which will

be satisfactory to the parties, for it may be safely said that no contestants ever differed more widely with respect to the measure and extent of recovery. All that can be done is to deal with the question as best we may, endeavor as far as we can to approximate the justice of the case, and terminate this protracted and expensive litigation.

We come then in the order of time, first, to the rent for the year 1861. The circuit court held that this rent had been settled, and could not therefore enter into the account before the commissioner. The appellants insist that this decision is in direct conflict with the previous decree of the circuit court, which declared that Stuart, Buchanan & Co. should be accountable for a reasonable rent from the 1st January, 1861, to the 1st January, 1869. It must not be forgotten, however, that it was provided in the same decree that the commissioner should ascertain also what payments, if any, had been made by Stuart, Buchanan & Co. to White's heirs on account of rents for said period. The court, of course, would not in that stage of the controversy undertake to say whether the rent for any year, had or had not been paid.

All it could do was to direct an account of rents for each year of the occupation, and leave the question of payment open for inquiry and future adjudication. If, in taking the account, it appeared that the rent for any one year had been settled, any further inquiry for that year would be superfluous and improper, for then the parties themselves had determined what was a reasonable rent for such year by making and receiving payment. I think, therefore, the appellees were not precluded from showing the settlement of the rents for 1861. The only question then is, Have they succeeded in doing so?.

In the original bill of Stuart, Buchanan & Co. filed in 1862, they aver that they had paid the rent of 1861 to White's heirs, and that the latter by the receipt of the

money and by other acts, had ratified the Ackerman lease, and were therefore entitled only to a rent of $20,000 per annum during the whole period of the tenancy. The only persons who ever answered this bill were Newton White and William T. C. White. Whilst both these defendants emphatically deny that there had been any ratification of the Ackerman lease, I do not understand that either of them seriously controvert the fact of the payment for the year 1861. There is no doubt that from the beginning William T. C. White, acting for himself and the other heirs of James White, collected the rents from the various lessees of the King's Salt Works. He collected them for five successive years from Col. Cummings, who obviously thought he was authorized to receive them. And when in March, 1862, Mr. Stuart paid Col. White the share of rent for 1861, to which King's representatives were entitled under the Ackerman lease, both parties must have believed that Col. White's authority to receive payment had not been revoked or questioned. The receipt given by Col. White on that occasion was just such a receipt as had been given by him uniformly to Col. Cummings.

That all parties concerned took the same view of the matter, is conclusively shown by the notice of the 12th June, 1862, given by White's heirs to Stuart, Buchanan & Co. That notice is in the following words:

"We hereby give you notice that from and after the 1st January, 1862, we will refuse to take for our respective interests in the King's Salt Works at the rate of $20,000 and taxes per annum, that being the rate of rent stipulated for between Thomas L. Preston and Spencer, Ackerman & Co., but we will demand and insist upon our proportion of the rents and profits derived by the working and using said estate."

It will be perceived that this notice recognizes the existence of the Ackerman lease, the rent of $20,000 to be paid

under it, and the unwillingness of the parties to accept rent at the same rate after the 1st January, 1862, and their determination then to claim a different rate of compensation.

What then became of the rent of 1861; upon what terms and at what rate was it to be settled?

The inevitable inference is, the parties considered it already adjusted upon the basis of the Ackerman lease.

It is highly probable that the appellants were at the time satisfied with the Ackerman lease as respected the year 1861, for it does not appear they ever made any objection to it, and I think Stuart, B. & Co., from their subsequent proceedings, had the right to conclude that no dissatisfaction existed, and to shape their conduct accordingly.

In 1862, however, a great change had taken place in the condition of the country, and it soon became apparent that the operations at the salt works would be upon a more extended scale than at any previous period. The appellants very naturally felt that $20,000 was an entirely inadequate compensation, and apprehending that the acceptance of the rent of 1861 might be construed as a ratification of the Ackerman lease throughout the term, gave the notice in question, and thus declared that after the 1st January, 1862, they would insist upon a different rent from that stipulated in the Ackerman lease.

Under all these circumstances, it seems to me the conclusion is irresistible that not only was the rent of 1861 paid, but was treated by all the parties as paid, and that it is now too late to raise any controversy on the subject, or to call in question the fact or the validity of such payment.

We come now to the rent of 1862, and here, it is conceded, we have to deal with a very embarrassing and difficult question. Much of this is due to the failure of Stuart, Buchanan & Co. to keep proper accounts of their transac-

tions and dealings at the salt works, as it was incumbent upon them to do by virtue of their obligations as tenants in common. Perhaps some apology for their conduct may be found in the circumstances by which they were surrounded. The numerous agencies operating at the salt works, the unsettled condition of the country, the unprecedented demand for salt, rendered it extremely difficult to keep such accounts. At all events, I am satisfied the failure to do so cannot be justly attributed to any fraudulent or improper motive on the part of Stuart, Buchanan & Co.

It is observable that the circuit court and the commissioner, although differing widely in the results attained, adopt the same plan for ascertaining the rent for the year 1862—that is to say, they find the quantity of salt produced that year and its value, and from these they estimate the rental value by comparison with the production of previous years in the time of peace. Thus the production of the two estates before the war was 300,000 bushels, of the value of 50 cents per bushel. The rental value of the King Salt Works was $22,000 per annum. In order to determine the production of 1862, ascertain the number of kettles on both estates; multiply this by the production of each kettle, estimated at four and a half bushels per kettle per day, and this gives us the daily production; multiply the daily production by the number of working days in a year, and we have the annual production of the two estates, of which the King estate is to be credited with its share in the same proportion that $22,000, the *ante-bellum* rent, bears to the *ante-bellum* production of 300,000 bushels. This plan, it must be admitted, is liable to many grave objections; but after the most careful examination, I can find no other that is not still more objectionable.

The commissioner estimates the number of kettles at 2,338, running 134 days, which gives a product of 1,409,000

bushels of salt, with one-half of which he credits the King estate, and upon this calculation he estimates the rent at one hundred and ten thousand dollars in gold.

On the other hand, the judge of the circuit court estimates the number of kettles at 1,820, which, as his figures show, are equivalent to 793 kettles for the whole year. From these 793 kettles he obtains a production of 988,838 bushels for the year, nine-twentieths of which gives to the King Salt Works a rent of $66,000 in gold. It will thus be seen that the circuit judge and the commissioner differ more than $40,000 in their estimate of a single year—a result due mainly to a difference in the estimated number of running kettles and a difference in the estimated production of the two estates, the circuit court crediting the King estate with nine-twentieths of the production only, whilst the commissioner credits it with one-half. There is in the record a statement made by Stuart, Buchanan & Co., which shows, as appellants claim, that there were on both estates two thousand and nine running kettles in 1863.

This statement was apparently very hastily prepared, and was probably only intended as a rough estimate of the number of kettles for the year named as compared with the number when Stuart, Buchanan & Co. took possession of the salt works.

The evidence shows beyond the shadow of a doubt that the twenty-six hundred and nine kettles running in 1863, not less than eight hundred were constructed in that year, and could not therefore have been in operation in 1862. This gives about eighteen hundred kettles running in that year, an estimate a little short of that made by the circuit court.

The evidence further shows that there were about three hundred kettles only in operation on the two estates on the 1st January, 1862. The construction of (15) fifteen or sixteen hundred kettles, must have required much time and

the expenditure of a large amount of labor and capital. It is very clear that the preparation for making salt upon a large and extended scale could not have been complete till late in the spring or summer of 1862. The very fact that the appellant did not till June of that year give the notice already mentioned, shows that they did not until then feel the necessity or propriety of demanding a higher rent than that stipulated in the Ackerman lease. I might cite other testimony scattered throughout this record in confirmation of these views, but it is impossible to do so consistently with any reasonable limit to this opinion. The main complaint made by the appellant is with the price of the salt in the year 1862, as fixed by the circuit court. It is admitted that about 400,000 bushels were sold by Stuart, Buchanan & Co. to the Confederate government, the State authorities, and the counties at the price of $1 per bushel. It is insisted, however, that Stuart, Buchanan & Co. had in their possession nearly 300,000 bushels of salt, disposed of by private contract at sums varying from 75 cents to $5 in gold per bushel.

In support of this charge, the appellants produce two witnesses—one of whom testifies that in 1862, he bought from Mr. Stewart 1,200 bushels of salt at $2 in gold per bushel, which, however, was never delivered. The other witness testifies that he manufactured about 800 bushels of salt in copartnership with Stuart, Buchanan & Co., which he sold at prices varying from $8 to $20 per bushel in Confederate currency. These constitute the only instances so far as the testimony shows of a departure from the established office price of $1 per bushel, and upon these two isolated instances the court is asked to presume other instances of like kind, and upon that presumption to enter a decree here in conformity with these extreme rates.

It may be that the inferences of counsel are correct, but surely it will scarcely be contended that they can be safely

made the basis to fix the measure of the recovery in this case. If it had been the habit of Stuart, Buchanan & Co. to sell salt at the rates claimed by appellant's counsel, I think Mr. Buchanan or Mr. Fowler would have been apprised of it. Indeed, the fact would have been susceptible of proof, by a cloud of witnesses. Such a course of conduct on the part of Stuart, Buchanan & Co. would have produced a storm of indignation in the country, and would have resulted, as stated by the witnesses, in placing the salt works under the control of the State authorities. When it is remembered that the established office price of the salt was $1 (one dollar) per bushel in Confederate currency, and at this rate it was sold to the Confederacy, the State government and the counties.

That the currency was in the fall of 1862 constantly depreciating, it seems to me that the appellants, so far from having any just cause to complain, have every reason to be satisfied with 50 cents, the price per bushel fixed by the circuit court. The rental value of the King Salt Works under the Robinson lease was $16,000 per annum; under the Preston lease was $22,000. Under the Ackerman lease was $20,000 for the year 1861; and now, under the decree of the court, it is fixed at $66,000—three times greater than under the highest renting at any previous period. It is impossible that the appellants can have any just ground of dissatisfaction with such a result. I think, however, that the real mistake committed by the circuit judge, if any, was not adhering to the results of his calculation based upon the production of the estimated number of kettles in a year. He made another calculation from which he ascertained that 709,448 bushels of salt were taken away by railroad transportation, and that 279,390 bushels were disposed of at private sale or otherwise than by railroad transportation. He, however, concludes that this latter estimate is too high, and that about 190,000 bushels more nearly

approximated the quantity taken away by private transportation; and upon this conjecture, for it is a mere conjecture, he estimates the salt manufactured and sold at 900,000 bushels, instead of 988,883 bushels, as ascertained by the number of kettles. Now, it seems to me that if the estimated production, based upon the number of kettles, was of any value as a basis of calculation, the results obtained ought to have been adhered to, and not abandoned upon what is conceded to be a mere conjectural estimate.

I think the circuit judge erred in this particular, and to that extent this decree must be reversed.

We come now to the rent of 1863. It is not extravagant to say that the calculations of the commissioner for this year are in the highest degree fanciful and excessive. He estimates the production of both estates at 2,700,000, which, at 50 cents per bushel, the price assumed, yields the sum of $1,350,000, nearly a half million dollars in excess of the fee simple value of both estates. He credits the King estate, not with one-half the quantity, but with 1,923,643 bushels, which, at 50 cents per bushel, amounts to nearly three times the fee simple value of that estate. The rent ascertained by him, founded upon this production, is $275,000 in gold, more than three-fourths the fee simple value of the King estate.

The fundamental error of the commissioner is in assuming that salt was worth as much, or commanded the same price per bushel in gold in the year 1863 as before the war. It is very apparent that an *ante-bellum* rent, payable in gold, and based upon an *ante-bellum* production, will not answer as a basis of calculation for a year in which the currency was rapidly depreciating at enormous rates and the cost of production increasing at corresponding, if not greater, rates. That the price of salt did not advance in the same ratio with the depreciation of the currency and the increased cost of labor, provisions and supplies, is fully established

by the testimony. The true mode of working out the problem before the commissioner would have been, not merely the ascertainment of quantities, but of values also.

Another error in his calculation is in crediting the King Salt Works with more than two-thirds of the production, a result based upon some alleged superiority of the brine over that in the Preston wells. The evidence upon this point is too conflicting and indefinite to furnish the court with any safe or reliable test to guide its action. Calculations based upon such a theory are in the highest degree unsatisfactory and dangerous.

On the other hand, the learned judge of the circuit court based his estimates on a rent of $300,000 in Confederate currency, which the State of Virginia, in June, 1863, agreed to pay Stuart, Buchanan & Co., for 500 kettles for a year. If 500 kettles are worth $300,000, 2,400 kettles ought to be worth $1,440,000 in like currency, which, reduced to gold, amounts to $190,000, the rental value of the two estates, of which the King estate is entitled to nine-twentieths, or $86,000.

It is claimed by the appellees that the rate thus adopted by the circuit court is manifestly unjust, because it assumes that the 1,900 kettles left in the possession of the occupying tenants were all of equal value, and could be worked with equal advantage and profit as the 500 kettles rented by the State, whereas it is shown that the State not only selected the very best kettles, but it had superior advantages and greater profits in operating them. I think there is great force in this objection, as there would perhaps be in any other calculation which might be adopted. But it is most obvious that if an attempt were made to base an estimate of the production of salt upon these supposed advantages possessed by the State, it would result only in disappointment and incalculable mischief to the one side or the other in this controversy. Upon an inquiry of that sort

we should have the conjectures of witnesses, as interminable as they were conflicting.

The appellants claim, however, that the calculations of the circuit judge are in direct conflict with the representation of S., B. & Co. to the legislature of 1863-4; that according to these representations the capacity of both estates in 1863 was equal to the production of 13,000 bushels per day, with 240 working days to the year. This would give the enormous product of 3,120,000 bushels. It would be extravagant in the highest degree to suppose that the kettles upon the two estates in 1863 could have been so operated as to produce such a result. Neither fuel nor supplies could have been obtained in that year sufficient to the production of such a quantity, without an enormous increase of the cost of the production, greatly in excess of the selling price. It is worthy to be noted that S., B. & Co. do not say that the actual production was 13,000 bushels per day, but that the capacity of the works had been increased to that extent. It has been well said that nothing can be more illusory or fruitful of loss, as the basis of a business undertaking, than mere paper estimates. If, however, the admissions of the appellees are relied on, all they say in the same connection ought to be considered. In the same connection, S., B. & Co. say " that since the State agent, Colonel Clarkson, took possession, in June, 1863, not a furnace had been built or enlarged, and not a kettle put in operation; but, on the contrary, furnaces counting not less than twice as many kettles as all the ten furnaces worked by the State are now idle and unoccupied." These representations are fully supported by the evidence. Hugh McClung, in a paper laid before the State assessors in 1864, stated that the production of his 208 kettles, distributed in four furnaces, would be equal to 374,400 bushels, and yet it is proved that this occupant, who was manufacturing for two States, having free use of the railroads and full control of both domestic

and foreign transportation, unobstructed by the orders of the Virginia State authorities, made only 90,286 bushels in 1863, an average production of less than two bushels per kettle per day.

The record contains a statement made in the year 1863 by Charles Scott & Co., McClung, Jaques & Co. and others, to the effect that with the 1,142 kettles under their control, they could have produced under ordinary circumstances 99,910 bushels of salt, but owing to the impediment thrown in their way by Col. Clarkson in the way of wood transportation, they only made about 19,000 bushels. Numerous examples of the same kind may be cited. Indeed the record abounds with proof of the utter unreliability of mere paper estimates as compared with actual results. The evidence shows that most, if not all the furnaces were run very irregularly in the year 1863, and that the average time of the whole did not exceed one-half of the year.

In the light of these facts, it would be the grossest injustice to hold the appellees responsible for a statement, made probably without access to reliable sources of information, and which was palpably based upon erroneous and extravagant estimates.

When we consider the difficulties attending the manufacture of salt in 1863 and 1864, the high price of provisions, labor and supplies of every description, the constant depreciation of the currency, the absolute loss of one-third by the act of the Confederate congress of February, 1864, without any substantial increase of values, it is vain to say that a rent of $86,000 does not afford an adequate compensation to the owners of the King estate. It is nearly four times the amount of any rent ever paid by any lessee of that estate on any previous occasion. To sustain it, we must presume that the appellees sold 1,200,000 bushels of salt at a sum actually equivalent to 50 cents per bushel in gold.

I do not think the appellants have any just cause of complaint with the amount just decreed them; nor am I disposed to reverse the decree in favor of the appellees, for the commissioner and the court concur in the opinion that the amount is not excessive, and as has been already stated wherever there is such concurrence, an appellate court is not inclined to reverse unless in a case of palpable error.

Before leaving this branch of the case, it is proper to state that for the period composed between the 1st of January, 1863, and the 8th of June, 1863, the circuit court fixed the rent at $36,000, which is five-twelfths of $86,000. In other words, it adopted the rent of 1863 and 1864 as the basis for ascertaining the rent for the five months between the 1st January, 1863, and the 8th of June. I see no well founded objections to this mode of calculation or to the result; nor do I understand that either is seriously controverted. We come now to the rent of 1864.

The commissioner, still adhering to his calculation adopted for 1863, estimates the joint production of the two estates at 1,404,000 bushels of salt, crediting the King estate with one-half, which gives a rent of $95,000 in gold. All the objections which have been urged against his estimates for the year 1863, apply with increased force to those of the year 1864, when the currency had undergone a still more ruinous depreciation and the difficulties of obtaining supplies and wood enormously increased.

Added to these were the numerous raids of the Federal forces constantly threatening the salt works and seriously interfering with the operations of the occupying tenants.

It appears that in August, 1864, the State impressed 500 kettles belonging to Stuart, B. & Co., the rent of which was assessed at $773,000 in Confederate currency. The circuit judge adopted this as his basis and assumed that if 500 kettles were worth $773,000, 2,400 kettles ought to be worth $3,710,400 in Confederate currency, which reduced to gold

gives a rent of $157,888.36, of which the King estate is entitled to nine-twentieths or $71,650.21.

It cannot be denied, I suppose, that the State had every advantage over the individual lessees in manufacturing salt, arising from the power of impressing supplies, labor, provisions and transportation. It could, therefore, better afford to pay a liberal rent than any of the occupying tenants. It has been therefore argued that the rule adopted by the court does injustice to the appellees.

It may be so, but for reasons already stated, I think it is impossible to make any safe estimate based upon the supposed advantages possessed by the State. Considering the great depreciation of the currency, a rent of $773,000 for 500 kettles in August, 1864, did not exceed a rent of $300,000 for 500 kettles in June, 1863.

There is, however, a much more serious objection to the estimates of the circuit court for the year 1865. In fixing the rent for the year commencing in June, 1864, the learned judge has charged the appellees with the rent of the whole year, and yet the proof shows that the salt works were entirely destroyed by the Federal forces the latter part of December, 1864, the interval having been occupied with the repair and restoration of the property. If the appellees had occupied the premises under an express contract to pay rent, it may be they would be liable, notwithstanding the destruction of the property. For the rule would seem to be, according to the English authorities, that no accident to the leased tenement, "whether by fire, or tempest, or through the casualties of war, will relieve the lessee from his express covenant to pay rent, unless he has protected himself by a saving clause in the lease." The law does not appear to be entirely settled in the United States. It has been held in Pennsylvania and South Carolina that the occupying tenants were entitled to an abatement of the rent, the leased tenement having been destroyed by the

British forces during the Revolutionary war. The reason the tenant is held liable for the rent notwithstanding the destruction of the property is, that by his own express covenant to pay rent he has created a duty or charge upon himself which he is bound to make good even against inevitable accident. Where, however, the law creates a duty or charge, and the party is disabled from performing it, without his fault, a different rule prevails. And I have found no authority which holds that the tenant is liable for the rent, notwithstanding the destruction of the premises, in the absence of an express covenant to pay. In the case before us, the liability of the appellees rests upon the sole ground of the use and occupation of the property to the exclusion of their cotenants. It is upon this ground, and no other, they can be held accountable. The property having been destroyed by the public enemy in time of war, and they having been deprived of its use and enjoyment without their default, they ought to that extent to be released from the obligation to account.

The point, it seems to me, is too clear for discussion, and I have been unable to understand the grounds upon which the learned judge of the circuit court arrived at a different conclusion. Unless I am greatly at fault, he has allowed the sum of $29,056 for the first five months of the year 1865, and to that extent the decree is erroneous. The allowance of a rent of $6,177.16 for the half year ending the 31st of December, 1865, is correct, and nothing need be said in support of it.

We come next to the rent for 1866. This the court fixes at $22,000, upon a production of 286,769 bushels of salt, which is assumed as the average *ante-bellum* production, or very nearly approximates it.

If it be conceded that salt in that year was worth $1 per bushel in State currency, it must be also conceded that the currency was considerably depreciated. The price of labor

and supplies was high, and the occupying tenant incurred the whole expense of repairing and restoring the property. When these facts are taken into consideration, it would seem that a rent of $22,000 in 1866 is fully equivalent to the *ante-bellum* rent of $22,000 per annum.

It is not necessary to say much with respect to the rents of 1867 and 1868. The court and the commissioner concur in fixing them at $31,200 for each year. Where the lower court and the commissioner agree in a case of this sort, the appellate court will not interfere unless the error is gross and palpable. It appears that in the fall of 1868, the King's Salt Works was rented out under a decree of the court at the sum of $31,200 for the year 1869. This is a fair test of the rental value, at least, as fair as any that can be obtained and was very properly adopted as just for the years 1867 and 1868. In 1867, the production of both estates was 440,000 bushels in round numbers, and in 1868, 406,000 bushels. Taking into consideration the continued depreciation of the currency, the high price of labor and supplies, a rent of $31,200 for the King Salt Works upon a joint production of 420,000 bushels is about the equivalent of a rent of $22,000 upon a joint production of 300,000 bushels. I think, therefore, there is no error in this part of the decree. This disposes of the question of rent for the successive years from 1861 to 1868, inclusive.

Upon a review of the whole case, I am satisfied that the appellants have no just cause to be dissatisfied with the decree of the circuit court. Had the salt works been rented out in 1860, in anticipation of the termination of the Preston lease, the renting, according to the usual and uniform course adopted, must have been for five years. No one then apprehended the extraordinary demand for salt, resulting from the blockade of the southern ports, and it is safe to say that the rate at which the King's Salt Works would have been leased, would not have exceeded those stipulated in the Preston or Ackerman lease.

If that estate had been annually rented out by the owners, and in the summer or fall of 1861, the renting for 1862 had taken place, no one, I imagine, seriously entertains the idea the property would have commanded a rent of $66,000 in gold. The thing is incredible. Few men, if any, anticipated a blockade so vigorous or so extensive, or a demand for salt so extraordinary with a supply so limited. The unsettled condition of the times, the troubles and disasters crowding upon us in every direction, and the general apprehensions and uncertainties of the future, would have deterred prudent men everywhere from incurring liabilities which might have involved them in utter ruin. After 1862, no renting could have taken place except for Confederate money, which would have perished in the hands of the holders, or have become almost worthless by its rapid and enormous depreciation. If the owners of the King estate had each for himself undertaken the manufacture of salt, there would have occurred a strife and confusion— a competition for supplies, labor and transportation, which would have resulted in loss to all the parties concerned.

I have no doubt that Stuart, Buchanan & Co. realized large profits from the control and joint production of the two estates, and it is very probable they accumulated very considerable fortunes.

The results are, however, due in a great measure to two causes combined. First, the skill, unexampled energy, and rare business qualifications displayed in the conduct of the business; and, second, the sagacity and sound judgment exercised in the investment of Confederate currency.

Whatever these appellants may honestly say or think to the contrary, and no one will question their integrity, their demand in this case is simply a claim to participate in the profits of the business. True, they ask only a reasonable rent, but when we come to analyze it, that reasonable rent means something commensurate with a just share of the

supposed profits. The English courts, in construing the statute of Anne, hold that it applies only where one tenant in common, or joint tenant, rents out the premises to a third person and receives more than his proportionate share, according to his interest in the subject of the tenancy. This court, however, in *Early and Wife* v. *Friend and als.*, 16 Gratt. 21, overruled the English doctrine and held that one tenant in common, or joint tenant, occupying the premises to the exclusion of his co-tenants, is accountable for receiving more than his joint share, whether paid by a stranger or derived from his use and occupation of the property.

The court was, however, careful to guard the rule thus laid down by saying that the occupying tenant is liable only for the fair value of the property in the condition in which it was at the time it went into his possession, and that the cotenants are not entitled to the benefit of the issues and profits made by the application of the skill and capital of the occupying tenants bestowed on the common property. The compensation of the cotenants cannot be made to depend upon the accident of the occupying tenant being a good or a bad manager, a prudent and careful person, or a rude, reckless speculator. As the cotenants do not share in the risk, they ought not to share in the profits of the operation. If this rule shall be applied in the present case, and the statement of Stuart, Buchanan & Co., made during the war be accepted as true, that when they took possession of the property in 1861 there were but 226 kettles on both estates, not exceeding 100 bushels per day, it would be difficult to sustain either the commissioner or the judge of the circuit court in their conclusions. It is obvious, however, that this is one of the cases in which the rule should be modified in its application by a change of circumstances. Still, I imagine it is perfectly clear that the appellants have no just claim to any share of the profits which have accrued from the skill, the capital, and

energy of the occupying tenants. Nor must it be forgotten that the manufacture of salt at Saltville during the greater part of the war was attended by great risks and expense, and subject to innumerable contingencies, which could not arise in a time of peace. Labor, material, and provisions could only be procured by great outlays of capital. Wood, the most important article in the manufacture of salt, sold at enormous prices, and was at all times obtained with difficulty.

These obstacles in the way of the occupying tenants were increased by the raids of the Federal forces, so often occurring and so menacing in their character as seriously to interfere with the operations at the salt works, and in a great degree diminished the profits of the business. If, therefore, we are to depart from the rule laid down by this court in *Early* v. *Friend,* we must not fail to take into consideration all the circumstances by which the appellees were surrounded.

And this is of itself sufficient to show the difficulties, if not the impossibility, of taking an account of rents and profits which result from the skill, the energy and capital of the occupying tenants.

Under such circumstances, the learned judge of the circuit court adopted a plan of settlement, which was perhaps the only practicable solution of the problem. In the year 1862, no extraordinary depreciation of the currency or changes of value had taken place. For that year he therefore adopted the *ante-bellum* rent, based upon the estimated *ante-bellum* production, and allowed the appellant an increased rent in proportion. It was, however, very clear this rule could not be safely applied to the years 1863 and 1864. For these years, therefore, he adopted the rent agreed to be paid by the State as the basis of his calculation. For the last six months of 1865 and the year 1866 he again adopted the *ante-bellum* rent and production as the standard.

For 1867 and 1868 he ascertained the sum to be paid, by taking the amount for which the property was probably rented in the fall of 1868, under a decree of the court.

With all due respect for the learned counsel on both sides, I must be permitted to say, that in my humble opinion the learned judge has worked out a very difficult problem with rare skill and judgment. I do not mean to say that he has attained complete justice, for that, perhaps, was an impossibility; but I do mean to say that his plan of settlement is freer from objections than any which has been suggested. Subject to the exceptions already mentioned, I think there is no error in his decree.

The only remaining matter to be considered grows out of the appeal taken by Mr. Wyndham Robertson. It appears that Mr. Robertson was and is the owner of an interest of one-ninth in the King estate. He was also the claimant of another interest, one-sixth of one-eighth, acquired on the 12th November, 1850, by purchase from Margery Stuart, a child and heir of Mrs. Hannah Allen, who was entitled to an interest of one-eighth in the King estate. On the — September, 1858, Mr. Robertson, with other parties concerned, executed an instrument of writing, in which they agreed to unite with Thomas L. Preston in a contract of lease of the King Salt Works, "to the extent of their interest therein," for a term of ten years. Accordingly, Mr. Preston, on the 11th October, 1858, executed the lease to Spencer, Ackerman & Co., already adverted to in this opinion. The rent agreed to be paid for the King estate was twenty thousand dollars per annum. It is conceded that the one-ninth interest owned by Mr. Robertson is embraced in the Ackerman lease and is governed by the terms of the renting therein specified.

The question is, whether the interest purchased from Margery Stuart, and known as the "Allen interest," is also included in that lease. If it is so included, then Mr.

Robertson is entitled to be paid by Stuart, Buchanan & Co. a rent at the rate stipulated in the Ackerman lease. If it is not, he is entitled to a reasonable rent, ascertained and settled according to the rule laid down in the case just decided between White's heirs and Stuart, Buchanan & Co. Now, it will be admitted on all sides—certainly it has not been denied—that the instrument of writing executed by Mr. Robertson and others is sufficiently broad and comprehensive in its terms to embrace the "Allen interest," as well as the one-ninth owned by Mr. Robertson. The language is, that the parties "bind themselves to unite with Thomas L. Preston in a contract of lease of the King's Salt Works, with its appurtenances, to the extent of our interests therein, for a term of ten years." If, therefore, the Allen interest is not included in the contract, it must be because of the existence of some fact or understanding *dehors* the instrument of writing which confines its operation to the one-ninth interest owned by Mr. Robertson. It is very true that the decree of the district court of the United States of the 24th September, 1853, had declared the "Allen interest" to be the property, not of Mr. Robertson, but of John Vint, and that decree had not been reversed when the Ackerman lease was executed in 1858. Whether it had been then appealed from, does not distinctly appear. It is certain that neither Mr. Robertson nor any of the parties injuriously affected by that decree had any idea of acquiescing in it. None of them regarded it as final, or as settling the title to the property in controversy. Mr. Robertson certainly had no thought of submitting to the decree; he regarded the "Allen interest," or a part of it, as his property, and he was satisfied, as he tells us, that the decree would be reversed upon appeal to the supreme court of the United States. Acting upon this conviction, he retained in his hands, during the five years he was lessee of the property, such portion of the rents as was equal to his

share or proportion of the "Allen interest." When, therefore, in the year 1858, Mr. Robertson united in the Ackerman lease, he not only supposed he was entitled to the Allen interest, but as a matter of fact he was entitled to it.

For the supreme court of the United States, when the case came on in that court, reversed the decree of the district court—thus affirming Mr. Robertson's title to the property. I repeat, therefore, that the "Allen interest" must be held to be included in the Ackerman lease by the very terms of Mr. Robertson's contract, unless it could be clearly shown by competent testimony that the parties intended to exclude it. It is difficult to understand what possible motive Mr. Robertson himself could have had for desiring to exclude it. He was very willing to transfer his large and valuable interest of one-ninth. Why should he desire to except from the operation of the lease the comparatively trifling interest of one forty-eighth? If he was willing to accept a rent at the rate of $20,000 for the greater interest, can it be supposed he was unwilling to accept it also for the less, or must we believe that Mr. Robertson was disposed to determine for himself the rental value of one interest, and to leave the other to be determined by the courts? It is very clear that he could not possibly sustain any loss or damage by including the "Allen interest" in the lease to Spencer, Ackerman & Co. For, if the decree of the district court should be reversed, the "Allen interest" for the term of ten years would have passed to the lessees.

On the other hand, in the event of an affirmance of the decree of the district court, it would clearly appear that Mr. Robertson never had any title to the "Allen interest," and, as a necessary result, his contract with Preston would be construed as not embracing it. Under such circumstances Mr. Robertson could not be held liable upon any covenant of title or for a breach of contract, for by the

very terms of his agreement he was to unite with Preston only " to the extent of his interest in the King Salt Works. The terms thus employed were therefore sufficient to include the Allen interest in the event of a decree in Mr. Robertson's favor, and they were equally sufficient to protect him against any future liability in the event of an adverse decision.

The only circumstance, as I conceive, militating against the view now taken, is the provision contained in the fourth clause of the contract with Thomas L. Preston. Under that provision, the rents were to be paid to the parties respectively, according to their interest in the property as shown by the schedule there referred to. The schedule does not show that Mr. Robertson claimed the Allen interest, and hence it might be inferred it was not intended to be included in the Ackerman lease. It is very apparent, however, that the operation of the first clause which transfers Mr. Robertson's entire interests, was not designed to be limited or controlled by the fourth clause. The object of the fourth clause was merely to designate the amount of rent to be paid the parties severally, according to their respective well-ascertained interests, as to which there was no controversy. Mr. Robertson could not, of course, demand that the rent accruing upon the "Allen interest" should be paid to him, and it is very certain the lessees would not have bound themselves to make such payment. That interest being at the time in litigation, the rents were under the control of the courts, and must have been paid over to the receiver. The payment to the receiver operated as a payment to the successful party in the pending litigation. It was therefore unnecessary, as it would have been improper, for the parties to insert in their contract any stipulation with respect to the payment of the rents accruing upon the "Allen interest."

The views here presented are strengthened by the subse-

quent conduct of the parties. It appears that by a decree of the Federal court, entered in April, 1869, Samuel F. Hurt was appointed a receiver, with authority "to collect the rents due and to come due, and to settle with the occupants of the salt works and other real estate in controversy, known as the Allen interest, and to collect and loan out the funds due upon them."

Now, if the receiver was to settle with the occupants of the salt works, and to collect the rents then due, upon what basis was he to settle? Was he to enter into an investigation, take an account, ascertain what might be a reasonable rent and demand its payment, and thus in effect do what the circuit court and this court have been attempting to do for ten years? It is safe to say that no one ever entertained at that time such an idea of the duties of the receiver.

It must have been intended that in receiving the rents he should proceed upon the basis of the rent stipulated in the Akerman lease. It is impossible to give any other construction to the decree. It has been said that such a construction would involve the federal court in an assumption of jurisdiction belonging to the circuit court of Washington county, which had control of all these questions. This may be true with respect to persons who were not parties in the federal court, and did not consent to the decree in question. But this was a consent decree, entered with the approval of Mr. Robertson, through his counsel, Beverly R. Johnston. It is too late now to call in question either the authority of the attorney to consent to such a decree or its binding force upon the client.

After it was entered, the receiver proceeded with the collection of the rents, including those accruing from 1864 to 1868 inclusive, at the rate prescribed in the Ackerman lease. He paid to Mr. Robertson his share or proportion of those rents, it being perfectly well known to the latter that the

collection had been made upon the basis of the Ackerman lease. It does not appear that Mr. Robertson expressed any dissatisfaction with the course of the receiver in making these collections. No one acquainted with Mr. Robertson will question his veracity, or the sincerity of his convictions, in this matter, and if we were permitted to determine this case by our convictions of his integrity, we should have little ground for questioning the justice of his claim; but we must apply to him the same rule we apply to others. We must look to the terms of the written contract into which he deliberately entered, explained and construed by his contemporaneous and subsequent conduct. Looking to these, it is impossible to resist the conclusion that Mr. Robertson's share of the Allen interest was included in the Ackerman lease, and that its rental value is to be ascertained by the rate prescribed in that lease.

Before concluding this opinion, I must not forget to say that I concur with the learned judge in the opinion that what is known as the Claiborne interest is to be treated as real, and not as personal estate. So much time has, however, been occupied in the discussion of the other topics that I must content myself with this simple announcement, without attempting to give any reasons for the conclusion I have reached. This disposes of all the questions presented for our consideration, which I rejoice to say brings me to the close of this most perplexing and uninteresting case.

DECREE REVERSED IN PART.