# CHARLESTON

## McNeely v. South Penn Oil Company.

Submitted September 15, 1905. Decided December 5, 1905.

1. TENANCY IN COMMON—*Waste—Accounting.*

   The basis of accounting, between tenants in common, joint tenants and coparceners, for waste, effected by the extraction of petroleum oil from the common property, under circumstances which make it reasonably certain that the party, so taking oil, acted with-

out fraud and under the belief of good title in himself to the whole of the property, though not without notice of defect of title, is the value of all the oil produced from the land, less the whole cost of its production, including the cost of drilling producing wells. (p. 440.)

2.  OIL LEASE BY CO-TENANT.

If one co-tenant execute an oil lease, purporting to cover the whole of the common property, under which the lessee produces oil, delivering to the lessor part thereof as royalty, it is proper to require the lessor and lessee jointly to make reparation to the injured co-tenant, and to order satisfaction of the decree against them to be made out of proceeds of the oil in the hands of the special receiver in the cause.   (p. 446.)

3.  OIL LEASE BY CO-TENANT—*Damages.*

·  In such case, rentals received by the co-tenant in possession for delay in drilling, under a provision of the lease, constitute no part of the damages and should not be included in the decree, nor are they to be accounted for as rents and profits, unless the lease is ratified or acquiesced in by the other co-tenant.   (p. 445.)

.4.  OIL LEASE BY CO-TENANT—*Ratification of Lease.*

A mere demand for discovery as to, and accounting for, such rentals in a bill expressly denying the title of the lessor and validity of the lease, does not amount to a ratification or adoption of the lease.   (p. 445.)

Appeal from Circuit Court, Wetzel County.

Bill by G. B. McNeely and others against the South Penn Oil Company and others.   From the decree defendant oil company appeals, and plaintiffs file cross-appeal.

*Modified and Affirmed.*

See 46 S. E. 499.

A. B. & R. F. FLEMING and C. POWELL, for appellants.

ERSKINE & ALLISON and R. W. McCOY, for appellee, Corning Oil Co.

THOS. P. JACOBS, EDWARD A. BRANNON, FRANK V. IAMS and THOS. R. HORNER, for appellees, G. B. McNeely, *et al.*

POFFENBARGER, JUDGE :

In this, the second appeal in *McNeely* v. *South Penn Oil Company*, the disposition of the first appeal in which is reported in 52 W. Va. 616, where all the facts out of which the questions then presented arose, are fully stated, the principal question is the basis on which the accounting for the oil produced shall be made.   After the case went back to the circuit

court, the South Penn Oil Company filed its second amended and supplemental answer, claiming the right to account on the basis of the value of the oil in place, which, it was averred, was the value of one-eighth of all the oil produced. Upon exception to the answer, so much of it as set up this claim, was stricken out by the court. Then the cause was re-committed to commissioner Basil T. Bowers to take further testimony and to ascertain and report the amount and value of all the oil obtained from the land occupied by said company with its oil operations, the amount and value of such part thereof as had been received by John W. Starkey, the lessor, and the amount of money expended by said oil company in operating for and producing the oil so obtained by it. The special receiver in the case and the Eureka Pipe Line Company were required to report the amounts of oil received by them, respectively, and the disposition made thereof, and the prices at which any of it had been sold. The commissioner reported that the South Penn Oil Company had taken, from the seventy-four acres of land occupied by it, oil amounting in value to $47,800.75, of which amount $3,592.11 had been paid by it to J. W. Starkey, the lessor, as royalty, and that the cost of producing the whole amount of oil thus obtained had been $35,698.24, making the sum of $12,102.51, the value of the production from said land, less the cost thereof. To this report both the plaintiffs and the South Penn Oil Company excepted, the former because the commissioner had allowed the cost of production to be taken out of the value of the oil, and the latter because the commissioner had refused to find and report, as the amount due the plaintiffs, the one-half of one-eighth of all the oil produced. The court overruled all the exceptions and decreed to the plaintiffs, on account of oil produced, the sum of $6,051.25, and, in addition thereto, $138.67, one-half of the cash rentals which had been paid to Starkey, making a total of $6,189.92. From this decree, the South Penn Oil Company appealed, assigning numerous errors in the decree, and McNeely and others, the plaintiffs, obtained a cross-appeal, on which they complain of the allowance, out of the fund, of the cost of production.

The court adopted the rule and principle declared and applied in *Williamson* v. *Jones*, 43 W. Va. 562. On both sides, the equity and legality of that rule is denied, and, for McNeely

and others, it is asserted that the Court never intended to prescribe, in that case, a general rule for the government of ordinary cases of this kind.  In this connection, they point to the language used by the Court in the syllabus, which is, "Under the circumstances, a party taking petroleum oil unlawfully is allowed all costs of production, including costs of boring productive wells, as a set-off against rents and profits." The phrase, "under the circumstances," is made the basis of the argument, and the character of the sale, magnitude of the production and the cost thereof, are relied upon as the circumstances which, in the opinion of the Court, justified the formulation of the proposition above stated as a rule for the special case.  As, in this case, the lessor and his tenant were not purchasers at a judicial sale, as in the case of Jones, and the production is not large, and the defect in the title of the lessor was disclosed by the records, it is insisted that this case cannot be assimilated to that of *Williamson* v. *Jones*, and that, therefore, the law of that case, on the subject of the basis of accounting,. has no application here.   Counsel for the South Penn Oil Company declare that the basis of settlement adopted is contrary to the great weight of authority, which is to the effect that when one co-tenant, acting in good faith, not fraudulently, but under a mistake, either of law or fact, commits waste in extracting oil or removing coal or other minerals, or timber, he is held responsible, not for the value of the finished product less the cost of production, but only for the value of the property in its natural state.

Aside from the difference in the volume of production and magnitude of cost, but one circumstance is pointed out in this case as distinguishing it from the one in which the rule complained of was declared.   That is the charge of fraud against Starkey.   The Court expressly held in *Williamson* v. *Jones* that Jones was not a purchaser without notice.   He was declared to be a purchaser with notice, whom ignorance of law did not excuse.   But it is said that Starkey not only had notice, but participated in a fraud perpetrated upon Mary Higgins by her husband.   The only evidence of this is that he took possession of the tract of land, one-half of which was owned by her and the residue by her husband, under a deed executed by the husband alone.   As it is not

perceived how the quantity and value of the oil produced can have any material bearing upon the equity of the case, the charge of fraud is the only matter urged, as ground for distinction between the two cases, that need be considered.

Mary Higgins was an invalid at the time the agreement for the exchange of land was executed by her husband and Starkey, in 1873, and died of consumption on the 12th day of February, 1875. Some testimony was taken for the purpose of showing her attitude toward the exchange, and an effort was made to prove that she was satisfied with it. One witness testified that she said she was glad it had been effected. She did not sign the executory contract, providing for the exchange, and the deed was not made until after her death. From these facts it is argued that she was unwilling to convey the land, that her husband clandestinely entered into the agreement with Starkey and had evil design in postponing the execution of the deed. At that time, the land was probably regarded as not very valuable. No one then dreamed of its mineral wealth. The transaction took place probably twenty years before that section of the country developed into oil producing territory. At variance with the charge of secrecy, circumvention and fraud, is the fact that Starkey took possession of the land immediately after the signing of the agreement, and while Mary Higgins was yet alive. Another circumstance which indicates that negligence, and not fraud, was the origin of these troubles, is that the land was not the homestead, for Higgins and his wife had obtained it in that same year from Edgell, by deed dated April 4, 1873. In view of these facts and circumstances we do not think the charge of actual fraud is sustained, and therefore, no substantial ground of distinction between this case and that of *Williamson* v. *Jones* is perceived.

Counsel for the South Penn Oil Company, in insisting upon the application of the common law principles governing the relation of co-tenants, seem to overlook the important fact that our statute has altered that law in this respect. By section 2 of chapter 92 of the Code of 1891, tenants in common, joint tenants and coparceners are made liable to one another for waste. At common law there is no such liability. Reference is made to the statute which gives an action of account against a co-tenant for receiving more than his share of rents.

and profits, section 14 of chapter 100 of the Code of 1899, supplying a defect in the common law, and corresponding to a similar statute passed by practically all the states, but none to the statute which creates liability for waste. It was this statute which gave the Court its serious trouble in *Williamson* v. *Jones* and prevented the adoption of the common law basis of settlement contended for here. In view of it, the Court, in order to allow any off-set whatever, was forced to adopt another principle, namely, that he who asks equity must do equity. In delivering the opinion of the Court, Judge Brannon said: "We are in a court of equity, which often departs from dry legal rules in the interest of substantial, even-handed justice. It does not seem that there is any inflexible, iron-clad rule in equity in this matter, unless our statute imposes it. This is not the case of a suit to impose upon the co-owner a personal liability, or a liability on his land, for improvements, nor to continue in possession till future profits shall reimburse them; but it is a case where the plaintiffs ask an account to charge Jones with rents and profits, and he seeks to set off improvements. Yea, more, it is a case where the plaintiffs ask to receive the benefit of the property in its improved condition,—to have the benefit of those improvements; that is, they ask pay for oil flowing through these very wells, without which wells there would not be a gallon of oil for them or for Jones. The law is well settled that in account of rents and profits you must charge the party for the property in its condition before his improvements, and not with the profits of his improvements (page 789, 30 W. Va., and page 265, 5 S. E.); Freem. Co-Ten., section 262; Code, chapter 91, section 2; *Moore* v. *Ligon*, 30 W. Va. 155, (3 S. E. 576); *White* v. *Stuart*, 76 Va. 566; *Early* v. *Friend*, 16 Grat. 21; *Fishack* v. *Ball*, 34 W. Va. 644, (12 S. E. 856). This is a strong factor in the solution of this question. The plaintiffs demand their oil, solely the fruit of the pluck and courage and energy of Jones, in hazardous enterprises, which might have involved him in ruin. They come into a court of equity, asking that we accord them their legal rights, and they are given unto them, but it is an adage that he who asks equity must himself do equity. He cannot, in every instance, eat the fruitage without sharing in the burden of the planting. I repeat that no immova-

ble rule binds a court of equity in this matter. * * * *
If we give Jones his expenditures, still a large amount goes
to the plaintiffs; otherwise Jones loses them, and this would
violate a rule of equity which, translated from the Latin, says
that 'by the natural law it is not right that any one should
grow rich by the detriment and injury of another.' Much
authority can be shown to support this doctrine in addition to
that given above. Story, Eq. Jur., section 1236, note; *Corcoran* v. *Corcoran* (Ind. Sup.) 21 N. E. 468 ; *Stewart* v.
*Stewart*, (Wis.) 63 N. W. 886; 11 Am. & Eng. Enc. Law
1107. But for Jones' acts, this oil would not have been produced, so far as we can see; but for him perhaps this oil now
enriching the plaintiffs would have been lost to them by being
drained off by wells on adjoining lands. Under these circumstances, equity cannot be blind to the argument that
Jones' acts have been to the plaintiffs a blessing, not even in
disguise, but plain and apparent. We cannot be deaf
to the argument that the labor, enterprise, and business ability of this man, though technically in the
wrong, appeal to a court of equity with strong call
for liberality so far as to repay him by set-off all
outlay in producing oil, including cost of productive wells,
and we resolve any doubt by so holding. A debt for such
improvement could not be made against the plaintiffs, nor
would we say that all their oil could be thus absorbed; but
here is a large surplus."

But for the equitable principle thus declared, it is difficult
to see how, in view of our statute, anything at all could be
allowed by way of offset, against the value of the oil produced. It is not a question of accounting for rents and profits,
but one of making reparation for a wrong, however innocently it may have been done, and the Court seems to have
gone to the utmost limit of equity jurisdiction to relieve from
the rigors of the common, and statutory, law in allowing expenses incurred in the performance of a wrongful act to be
set-off against the benefits derived therefrom. To go further
and limit recovery to the mere value of the oil in place, would
put the wrongdoer in the exact situation of one who enters
upon land and takes the mineral therefrom rightfully. Courts
of equity cannot ignore all property rights and fully exonerate from the consequences of legally wrongful acts.

An effort is made to obtain the same result, namely, an accounting on the basis of one-eighth of the oil produced as its value in place, by the contention that the plaintiffs, by the allegations of their bill, ratified and adopted the lease which provided for the payment of one-eighth of the oil as royalty. It does allege the receipt by Starkey of money as rental and bonus, sets up title in the plaintiffs to such money, prays a discovery as to the amount thereof and an accounting for, and payment of, the same by the lessors to the plaintiffs. But it attacks the lease, on the ground of invalidity, and declares that the extraction of the oil is wrongful, unlawful and wasteful, and denies that the lease confers upon the lessees any right or title to the oil, or justifies any entry upon the land, and denies any title or right in Starkey, authorizing him to execute the same. Its allegations are directly to the point that the lease is void, and that Starkey has no title to one-half the land, and its principal aim and object are to establish such invalidity and want of title. Although it sets up a demand derived from rents and bonus, which is apparently inconsistent with renunciation of the lease, all parts of the bill must be considered in seeking its true intent and purpose, and, if it appears that this demand rests upon some other ground than that of a ratification of the lease, it must be so regarded. There are no express words of adoption or ratification in the bill. On the contrary, the lease is repudiated and its validity denied most directly and emphatically. This is plainly sufficient to overthrow any mere inference of adoption arising simply from a demand for an accounting as to rentals and money paid as a bonus. The theory of the bill, as regards this demand, seems to be that this money, like the oil, has been derived from the land, and may be exacted notwithstanding the invalidity of the lease and want of title under it, as profit derived from the waste committed, and not as money obtained by virtue of the contract. Hence, our conclusion is that the bill does not ratify and claim under the lease.

The inclusion in the decree of the sum of $138.67, one-half of the rentals paid to Starkey by the South Penn Oil Company, under the terms of the lease, is assigned as error. As to the appellant, it is clearly an improper charge. It is no part of the proceeds of the oil extracted, nor does it represent any element of injury to the land. It accrued to Star-

key under a covenant in the lease, and arose wholly out of contract between Starkey and the South Penn Oil Company, and is in no sense connected with any waste or injury to the land. With this contract, the plaintiffs have no connection whatever. It never was their contract and they have emphatically refused to accept it or be bound by it. As they do not claim under the contract, and could not do so, without ratifying the same as a whole, and the money was received by Starkey on the contract and not out of the land, and was, as to the South Penn Oil Company, money paid out and not money received from the land, the inclusion of this sum in the decree was clearly erroneous.

Another contention is that it was error to render a decree against Starkey and the South Penn Oil Company, jointly, for the value of the entire one-half of the net sum realized from the oil, for the reason that Starkey had received $3,592.11, and the contention is that this should have been deducted and the decree rendered for the balance, and a separate decree entered against Starkey for the amount which he had received. This position is untenable. As the South Penn Oil Company actually took from the earth the oil in question, retaining seven-eighths thereof and delivering the residue to Starkey, or to the pipe line company for him, it was responsible for the whole amount thereof and could not discharge itself by payment or delivery to anybody except the rightful owners. It was the actual despoiler of the property. Its drills, machinery, appliances, agents and employes actually pierced the soil of the plaintiffs and severed and brought up their oil unlawfully and wrongfully. Starkey's unauthorized and void contract did not do that. But for the acts done under it by the lessee, it would have been harmless. Having done this injury, the oil company cannot discharge itself by making reparation to any one but the injured party. It cannot say to him, "You must look to my partner in wrongdoing because some of the benefits thereof accrued to him." The decree is, therefore, not erroneous in this respect.

On the 3rd day of October, 1903, the court decreed that partition of the land be made, and appointed commissioners for that purpose, after having ascertained that C. H. Ice and G. B. McNeely were entitled to forty-five acres of the tract, Waitman, Ida and Martha Higgins to five acres, John W.

Starkey to twenty-four acres and Hezekiah Hood to twenty-six acres, but no actual partition appears to have been reported or decreed. In this state of the record, it is said the court erred in decreeing partition of the land. To this it suffices to say the decree is not appealable. It makes no partition, and does not settle the principles of the cause. Evidently this ascertainment was made merely for the purpose of determining the basis for a division of the proceeds of the oil produced. Only to that extent does it seem to have been made effective or fruitful. An actual partition would not ordinarily be by the acre without regard to value. In this we see no error.

. In pronouncing its decree, however, the court erred in one other respect. Three infant children of Louis Higgins, a son of Mary Higgins, are defendants in the cause and are entitled to five-seventy-fourths of the amount ascertained to be due from Starkey and the South Penn Oil Company. Their interest was overlooked and the whole amount decreed to the plaintiffs. Of this the South Penn Oil Company justly complains because these infants may hereafter demand payment of their share, and in that case there would be a double recovery to that extent. Deducting from the amount of the decree the sum of $138.67, the money arising from rentals paid, the whole amount due is ascertained to be $6,051.25. Of this the plaintiffs are entitled to a decree for the sum of $5,642.38, sixty-nine-seventy-fourths thereof, with interest thereon from the 23rd day of September, 1904, the date of the decree appeal from.

It is said the court erred in directing the receiver to pay, out of the proceeds of oil in his hands, the amount decreed to the plaintiffs. The ground of this suggestion is not stated. It seems to have been put in by way of precaution, to broaden the objection to the personal decree so as to make it reach specifically that part which requires satisfaction out of the fund in the hands of the receiver. No independent ground of exception is perceived. The fund arose from the oil unauthorizedly taken from the land and sold. Plaintiffs had the right to follow it up and assert a lien upon it. But the amount to be so paid should have been limited to the sum of $5,642.38, with interest as aforesaid.

The Corning Oil Company, operating upon twenty-six

acres, the residue of the one hundred acre tract in controversy, did not appeal from the decree against it, but the plaintiffs did and it filed a brief in which error might have been cross assigned, but seems not to have been. The same proceedings were had against this company as against the South Penn Company, and the same defenses were interposed, up to the point of taking the decree. There, the court made a distinction. Instead of allowing, against it, one-half of the value of the production after deducting the cost, the court decreed one-half of the value of one-eighth of all the oil produced. The production amounted in value to $26,646.60, and the cost to $24,095.66, making the difference $2,550.94. The one-eighth of the value of the entire production was $3,330.82, and the decree was for $1,704.41, one-half of $3,330.82, plus one-half of $78.00, the amount received from rentals by Hezekiah Hood, the lessor. Under the principles hereinbefore applied, on the appeal of the South Penn Oil Company, the amount that would have been decreed is $1,275.47, one-half of $2,550.94. But counsel for the Corning Oil Company do not, in their brief, complain of this. Their sole contention is that the basis of the accounting adopted in their case is correct and is the proper rule for the government of all similar cases. They do not ask to have the amount decreed reduced, and the only ground of complaint against it by the plaintiffs is that it is too small. They claim from this company the value of the entire production, $26,646.60, without any deduction on any account. Nobody asks that the amount of the decree be cut down. The Corning Oil Company is satisfied with it, apparently willing to pay it, and the plaintiffs only ask that it be increased. Under such circumstances, the Court is clearly not bound to disturb it. Errors of this kind may always be waived. If the decree is erroneous in allowing more than the said sum of $1,275.47, the question would be whether the Court, on its own motion, could, and, under the circumstances, ought to, correct it. But is it clearly erroneous? The sum of $1,275.47 is less than the value of the oil in place. The allowance of cost of production, proceeds not upon a legal right, but an equitable one, as has been shown. It may be taken off of the profits derived, but may it be deducted from the value of the property taken? Does not the value of the oil in place stand upon a different footing from that of the

added value, consequent upon its removal? Did not the trial court distinguish between the two cases upon this ground, and is it not a substantial ground for such discrimination? This question has not been discussed or raised in this Court. Conceding that the Court might, on its own motion, correct a palpable error of this kind, in the absence of any request for such action, it does not follow that it should, or could, do so, when the question of error is doubtful. For this reason, the decree against the Corning Oil Company will not be disturbed.

For the reasons above stated, the decree complained of will be so modified and corrected as to require the appellant, the South Penn Oil Company, and J. W. Starkey to pay the plaintiffs the sum of $5,642.38, with interest thereon from the 23rd day of September, 1904, to be paid by H. B. Furbee, special receiver, out of the funds in his hands, instead of the sum of $6,189.92, and, as so modified and corrected, the same will be affirmed; but costs in this Court will be allowed the appellant, the South Penn Oil Company.

*Modified and Affirmed.*