573 F.2d 1123
 8 Envtl. L. Rep. 20,487
 PUGET SOUND GILLNETTERS ASSOCIATION et al., Petitioners,
v.
UNITED STATES DISTRICT COURT FOR the WESTERN DISTRICT OF
WASHINGTON, Respondent,
United States of America et al., Real Parties in Interest.
COLUMBIA RIVER FISHERMEN'S PROTECTIVE UNION, INC., et al.,
Petitioners- Appellants,
v.
UNITED STATES DISTRICT COURT FOR the DISTRICT OF OREGON, Respondent,
and
United States of America et al., Real Parties in Interest-Appellees.
UNITED STATES of America et al., Plaintiffs-Appellees,
v.
STATE OF WASHINGTON et al., Defendants-Appellants.
 Nos. 77-3129, 77-3208, 77-3209, 77-3654 and 77-3655.
 United States Court of Appeals,
Ninth Circuit.
 April 24, 1978.
 
 Charles E. Yates (argued), Douglas M. Fryer (argued), Joseph T. Mijich (argued), of Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for petitioner.
 James W. Moorman, Acting Atty. Gen., Washington, D. C., Kathryn A. Oberly, Atty., (argued) Dept. of Justice, Washington, D. C., for respondent.
 James M. Johnson, Asst. Atty. Gen. (argued), Olympia, Wash., for defendant-appellant.
 Appeals from the United States District Courts for the Western District of Washington and the District of Oregon.
 Before GOODWIN, WALLACE, and KENNEDY, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 These consolidated appeals are the latest in a series of efforts by agencies of the State of Washington and various associations of non-Indian fish catchers to overturn decisions of the District Courts of Oregon and of the Western District of Washington apportioning between treaty Indians and others the right to take fish. See United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); Sohappy v. Smith, 302 F.Supp. 899 (D.Or.1969); United States v. Oregon, 529 F.2d 570 (9th Cir. 1976). The geographic areas covered by these appeals are Puget Sound, the Washington coast south to and including Gray's Harbor, and the Columbia River.
 
 I Background
 
 2
 Litigants reached an agreement concerning the Columbia River, and that agreement was incorporated in a final decree of the District Court, Order of February 28, 1977, United States v. Oregon. That case retains minor problems of enforcement.
 
 
 3
 Agencies of the State of Washington and various of its constituencies continue to attack the judgment in United States v. Washington. Accordingly, we will again set forth the treaty basis of that decision and reaffirm its validity. The state's extraordinary machinations in resisting the decree have forced the district court to take over a large share of the management of the state's fishery in order to enforce its decrees. Except for some desegregation cases (see Morgan v. Kerrigan, 530 F.2d 401 (1st Cir.), cert. denied sub nom. McDonough v. Morgan, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976); Morgan v. McDonough, 540 F.2d 527 (1st Cir. 1976), cert. denied, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) ), the district court has faced the most concerted official and private efforts to frustrate a decree of a federal court witnessed in this century. The challenged orders in this appeal must be reviewed by this court in the context of events forced by litigants who offered the court no reasonable choice.
 
 
 4
 When Europeans first came to the Northwest, they found it occupied by many bands of Indians, who together exercised superficial control over the entire territory. The Indians knew nothing of English land tenure, but they were destined to learn.
 
 
 5
 For most tribes living along Puget Sound, the Pacific Coast, or a major stream, the yearly runs of anadromous fish were central to their economies and their cultures. As settlement from the East increased during the 1840's and 1850's, the white settlers created political pressure to limit Indian occupation to designated lands so that more land would be available to the settlers for enclosure and exclusive possession. Under instructions from the federal government, Governor Isaac Stephens of Washington Territory negotiated a series of treaties in 1854-55 to achieve settlement goals.
 
 
 6
 The treaties followed a pattern, the Treaty of Medicine Creek, 10 Stat. 1132 (1854), being typical. In article II the Indians reserved to themselves certain lands for reservations, and in article III the government further guaranteed them the right to continue taking fish at their usual and accustomed sites off the reservation, in common with all citizens of the Territory. This court has previously construed these clauses in earlier chapters of this litigation. We held that article II reserved an exclusive right to fish on the reservation and that article III established something analogous to a cotenancy, with the tribes as one cotenant and all citizens of the Territory (and later of the state) as the other. United States v. Washington, 520 F.2d at 685, 690. It is crucial to remember that these treaties did not grant the tribes anything; rather, the tribes granted the United States a vast expanse of land, reserving to themselves certain interests in it and in its profits a prendre.[1] The negotiations and treaties show that the right to take fish was to the Indians one of the most important rights reserved.
 
 
 7
 These rights were reserved, not by the individuals who happened to be alive in 1854 or 1855, but by tribes, with which the United States treated as sovereign entities.[2] See United States v. Washington, 520 F.2d at 688. The sovereignty of Indian tribes was the legal foundation for the relations between the United States and the Indians from the origins of this country, even though tribal sovereignty was viewed as the limited sovereignty of a domestic dependent nation. Under the Constitution, only the United States may deal with an Indian tribe. Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17-19 (1831); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557-60 (1832). All Indians are now citizens of the United States, 8 U.S.C. § 1401(a)(2), and the United States has not made treaties with the tribes since 1871, 25 U.S.C. § 71. As we noted in United States v. Washington, 520 F.2d at 685, tribal sovereignty does not fully explain current Indian status. Yet, as we also noted there, the concept of tribal sovereignty remains necessary to explain the extent of the tribes' reserved rights under the treaties, which have not been affected by the changes.
 
 
 8
 The Supreme Court has recently indicated that tribal sovereignty continues as a necessary part of Indian law. In McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), it overturned a state tax on income earned by a reservation Indian from reservation sources. In doing so it noted that tribal sovereignty provides a backdrop against which treaties and statutes must be read. The Indian claim to sovereignty long predates that of the United States or of any state. Indians on reservations remain a separate people, exempted from many laws of the state within whose borders they live. 411 U.S. at 172-73, 93 S.Ct. 1257. In Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Court upheld a hiring preference for Indians in Bureau of Indian Affairs positions. It noted that the preference was political, not racial, 417 U.S. at 553 n.24, 94 S.Ct. 2474 given to "members of quasi-sovereign tribal entities," 417 U.S. at 554, 94 S.Ct. at 2484. In United States v. Mazurie,419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), the Court upheld the power of Congress to delegate to an Indian tribe the right to regulate the sale of liquor on non-Indian land within an Indian reservation. The Court specifically rejected the Tenth Circuit's holding that Indian tribes are simply voluntary associations of private citizens, citing Worcester and McClanahan among other cases. 419 U.S. at 557, 95 S.Ct. 710.
 
 
 9
 Most recently, the Court held unanimously that a conviction by a tribal court does not bar federal prosecution for the same offense, because the tribal and federal courts are arms of different sovereigns. "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United States v. Wheeler, 435 U.S. 313, 322-323, 98 S.Ct. 1079, 1086, 55 L.Ed. 303 (1978).
 
 II Equal Protection
 
 10
 The state and the non-Indian fish catchers argue that to treat Indian fish catchers differently from non-Indians in allocating fishing opportunities and determining fishing regulations is a patent violation of basic equal protection principles. The Washington state courts have accepted this argument. See Washington State Commercial Passenger Fishing Vessel Association v. Tollefson, 89 Wash.2d 276, 571 P.2d 1373 (1977). Yet the most obvious conclusion from this background is that "equal protection" is an issue in this case only as it limits the state's regulation of Indian fishing in those areas where the state has a right to regulate. Comparisons between the numbers of treaty and nontreaty fishers, or the quantity of fish each category has an opportunity to take, are simply irrelevant under the law. The treaty tribes reserved their preexisting rights to fish, and they continue, as quasi-sovereign entities, to hold those reserved rights.
 
 
 11
 As we pointed out in United States v. Washington, 520 F.2d at 685, the treaties established something analogous to a cotenancy in the off-reservation fishery.[3] The treaty fishers derive their rights from one of the cotenants, the tribes. The nontreaty fishers derive their rights from the other, the state as the successor to the United States. The population-head-count disparity is the unremarkable result of normal principles of property law applied to changing numbers within cotenant classes.
 
 
 12
 Treaty fishers fish under the regulation of one quasi-sovereign, nontreaty fishers under the regulation of another. The rights of each sovereign are reserved or granted in the treaties, as the district court and this court have authoritatively construed them. These principles, applied in good faith, should answer most of the state's arguments; the problem is then one of enforcement.
 
 III Enforcement
 
 13
 * Enforcement is a problem because the state, its courts, and the non-Indian fishers have never fully accepted the principle that treaty rights can be claimed by a politically impotent minority. Before 1977 the state enforced the district court's orders grudgingly at best.[4] The current crisis is the result of a breakdown in state law enforcement in 1977. The state agencies had, with well-publicized reluctance, issued fishing regulations which, if enforced, would have met the district court's requirements. The agencies found, however, that some state prosecutors refused, again with the vocal approval of their constituents, to prosecute violations of the regulations in the few instances where the state issued citations. More important, the Washington Supreme Court in a recent series of decisions attempted to strip the state agencies of their power to comply with the district court's orders.
 
 
 14
 In Puget Sound Gillnetters Association v. Moos, 88 Wash.2d 677, 565 P.2d 1151 (1977), and Purse Seine Vessel Owners Association v. Moos, 88 Wash.2d 799, 567 P.2d 205 (1977), the court held certain regulations which the state Department of Fisheries issued to comply with the district court's orders to be beyond the Department's authority under state law.[5] The Department thereupon withdrew its regulations and issued new ones which made no attempt to protect tribal rights in the fishery. This situation led the district court to cease its attempts to work through the state government and, instead, to undertake fishery management directly. The court's enforcement actions are the special focus of the present appeal.
 
 
 15
 The tribes have a right to the enforcement of the treaties. This court has previously upheld the district court's construction of those treaties. The state was a party to that construction and remains a party now. The state is bound by the previous decisions.
 
 
 16
 The district court might have required the state to comply with its orders despite the conflicting state court rulings, but a direct confrontation would have raised serious questions of federalism. In an effort to minimize friction in a delicate state-federal situation without denying the tribes the rights they had reserved in the treaties and vindicated in court, the district court entered into the direct management of the fishery. Unless or until Congress acts to harmonize state and treaty interests in the fishery, the default of state government leaves the district court as the only instrument available to vindicate the treaty rights.
 
 
 17
 The pertinent questions, therefore, are not whether the court was right or wrong in 1974, but whether the court's actions are reasonable now. A subsidiary question is whether the court may enforce its orders against "nonparty" fishers directly.
 
 B
 
 18
 We held in United States v. Washington, 520 F.2d at 687-90, that the district court had discretion in its allocation of the fishery; we now extend that holding to recognize its broad discretion in managing the fishery. Further, none of the district court's actions now before us constitutes an abuse of that discretion.
 
 
 19
 The district court's orders set forth an allocation of fishing opportunity[6] between the treaty and nontreaty fishers intended, for 1977 only, to provide nontreaty fishers with 55% Of the total opportunity and treaty fishers with 45%. Because the district court included the amount taken in close-in ocean waters in the estimate of the total opportunity available to nontreaty fishers, the allocations generally pushed upward the opportunity in Puget Sound and the coastal streams for treaty fishers.[7] The difference in technology between white and Indian fishers is explained in United States v. Washington, and in the voluminous record here. The district court made its allocation orders upon the best technical advice available. It made its orders binding upon fishers' associations and upon all persons fishing under the authority of the State of Washington.
 
 
 20
 We have noted that the appellants argue that the district court's actions violate equal protection. The allocation is not an allocation among an indistinguishable mass of citizens but between two groups of persons each claiming undivided half-interests in a quasi-cotenancy. Each of the co-owners, the state and the tribes, is a quasi-sovereign, and the distinction between their members is thus political rather than racial. Ethnic origin is relevant only to the degree it happens to define tribal, and therefore political, status. An ethnic Indian who is not a member of a tribe with reserved fishing rights is in the same position with respect to Washington fish and game laws as any other citizen of the state.
 
 
 21
 We find no abuse of discretion in the district court's orders allocating the opportunity to take fish. The circumstances compelled the court to intervene in fisheries management, and the state does not appear to quarrel seriously with the specific allocations.[8] Indeed, we do not see how, given the state's inability or unwillingness to act, the district court could have protected tribal rights without making orders allocating fish in some manner. The numbers question is one of degree, not one of principle. Fish reach the tribal fishery after passing through the areas of heaviest nontribal fishing. The technology of commercial salmon fishing favors the nontribal fisher. If the nontribal fishery were not limited, the tribal fishery would never have the opportunity to take its full share, particularly in light of the need to provide an escapement of fish sufficient to preserve the run. Preserving the tribal opportunity requires limiting the nontribal opportunity.[9] In restating this obvious truth, we are not unmindful of the equities that lie on the side of the State of Washington. Its hatcheries help produce fish that will be caught by Indians as well as by non-Indians. But these equities call for state, federal, and tribal cooperation. They do not justify an attitude of total intransigence.
 
 IV Gray's Harbor
 
 22
 Because of uncertainty over whether the Quinault tribe would continue as a plaintiff in the earlier litigation, the original pretrial order defined the case area to include only coastal streams north of the Gray's Harbor watershed. This area includes the Quinault reservation and several off-reservation streams which are usual and accustomed locations for Quinault fishers. There was evidence at the trial concerning Quinault fishing in Gray's Harbor as well as within the case area. The court found that Quinault Indians had important fisheries, shared with other tribes, in Gray's Harbor and its tributaries, although it did not specifically find them to be usual and accustomed fishing places. 384 F.Supp. at 374-75. In 1974, in response to a motion by the state, the court held that the Quinault tribe had usual and accustomed fishing places in the Gray's Harbor area and that nothing in its previous decisions prevented them from using those places. The state filed a notice of appeal from this ruling, but the appeal apparently lapsed for want of prosecution.
 
 
 23
 Since the district court's original decision the Quinault tribe has been actively developing its Gray's Harbor fishery, both by increasing its fishing capacity and by managing the run to produce more fish. The state's actions in response to the state court decisions threatened the continuance of this Indian fishery, and the district court's order and injunction of August 10, 1977, as interpreted on August 12, excluded Gray's Harbor fishing from its protection. In response to this situation, the Quinault tribe, with the support of the United States, asked the district court to extend the case area to cover Gray's Harbor. The court agreed to the request. After a series of hearings the court allocated the opportunity to take fish between the treaty and nontreaty fishers in a fashion similar to its other allocations.
 
 
 24
 One question on appeal is whether the district court had the authority to expand the case area beyond that defined in the pretrial order and in its original decree; Gray's Harbor was included in the original complaint. The United States argues that the district court simply extended its decree, without modification, to cover a new area. We cannot agree with this statement. In its conclusion of law number 7, 384 F.Supp. at 400, the court explicitly excluded Gray's Harbor from the case area. To change the case area requires changing this conclusion of law. Since the decree depends on the conclusions of law, such a change would be a modification of the decree.
 
 
 25
 The state suggests that the tribe's request may be a motion to modify the decree under Fed.R.Civ.P. 60(b). Rule 60(b), however, deals with relief from judgments, not modification at the prevailing party's request to extend the judgment's scope.
 
 
 26
 The best interpretation of the district court's order is that it is a supplemental decree based on a modification of the pretrial order to conform to the evidence presented at the trial. Under Fed.R.Civ.P. 15(b), the pleadings may be amended, even after judgment, to conform to the evidence. The same standard should be applied to the modification of a pretrial order under Rule 16 in these circumstances. 3 Moore's Federal Practice P 15.13(1). We have previously upheld a district judge who applied Rule 15(b) standards to amend a pretrial order to conform to the proof, Gsell v. Adams, 316 F.Supp. 394 (D.Or.1969), aff'd, 431 F.2d 1204 (9th Cir. 1970), and one whose holding was based on a theory which had evidentiary support and was argued but which was not in the pleadings or the pretrial order, Dering v. Williams, 378 F.2d 417 (9th Cir. 1967).[10] Here the parties tried the issue of Quinault off-reservation fishing without objection. The trial court found that Quinault Indians traditionally used Gray's Harbor and its watershed for their fishing; its failure to use the treaty words "usual and accustomed fishing places" was the result of the exclusion of Gray's Harbor from the case area of the original decree. When the state asked the court to limit Quinault fishing in Gray's Harbor, the court specifically found that the Quinault tribe had usual and accustomed locations there; the state failed to pursue its appeal from this finding.[11]
 
 
 27
 In the light of these circumstances, we will treat the court's order expanding the case area as a supplemental decree based on an implied modification of the pretrial order to conform it to the evidence actually presented.[12] (The court retained continuing jurisdiction to enter further decrees.) As a supplemental decree, the order is appropriate. Some action was necessary to protect Quinault treaty rights in Gray's Harbor. The alternative to the supplemental decree would have been to bring a separate action, which the court would undoubtedly have consolidated with this action. The evidence and parties were such that the state would probably have been collaterally estopped to deny most of the necessary facts; the court could certainly have issued a temporary restraining order or preliminary injunction with little extra delay. The court did hold factual hearings before making its allocations of fishing opportunity. The only result of requiring a separate action would have been to add further complexity to an already complex case.[13]
 
 V Binding Nonparties
 
 28
 Several of the district court's orders were directed to individual fishers and to fishers' associations, although these persons and associations were not parties to the litigation. The fishers argue that the court was therefore without jurisdiction over them. The United States suggests several theories which would support the district court's actions. Without ruling on the other theories, we agree that the fishers are bound because they are in privity with the state, which is a party. Wild animals and fish belong to the people of a state as a whole in their sovereign capacity, and the state may regulate the manner of their taking or prohibit it entirely. Geer v. Connecticut, 161 U.S. 519, 527-30, 16 S.Ct. 600, 40 L.Ed. 793 (1896).[14]
 
 
 29
 Both Oregon and Washington hold that fish within their borders, so far as title can be asserted, belong to the state in its sovereign capacity in trust for its people. Anthony v. Veatch, 189 Or. 462, 474-75, 486-87, 220 P.2d 493, 498-99, 503-04, rehearing denied, 189 Or. 504, 221 P.2d 575 (1950); Columbia River Fishermen's Protective Union v. City of St. Helens,160 Or. 654, 661, 87 P.2d 195, 198 (1939); Monroe v. Withycombe, 84 Or. 328, 334-35, 165 P. 227, 229 (1917); Washington Kelpers Association v. State,81 Wash.2d 410, 414-415, 502 P.2d 1170, 1172-73 (1972), cert. denied, 411 U.S. 982, 93 S.Ct. 2274, 36 L.Ed.2d 959 (1973); State ex rel. Bacich v. Huse,187 Wash. 75, 79-80, 59 P.2d 1101, 1103-04 (1936). The Washington Supreme Court has recently specifically held that fishers have no private property rights in taking salmon. "In regulating the fisheries, the state is merely enacting legislation concerning its own property and prescribing the methods which may be used in acquiring it by private persons." Washington Kelpers Association v. State, 81 Wash. at 415, 502 P.2d at 1173. While the quoted statement of state ownership may be too strong, it shows that under Washington law the citizen's right to take fish is purely derivative of the state's power to regulate rights in the fish. The fishers' interest is therefore derivative of the state's interest; the fishers are in privity with the state and are bound by actions affecting its sovereign interests to which it is a party. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-41, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); Wyoming v. Colorado, 286 U.S. 494, 506-09, 52 S.Ct. 621, 76 L.Ed. 1245 (1932).[15] This being the case, the district court had authority to act against the fishers directly when it appeared that the state was unable to do so. Since the fishers are bound by the district court's actions, they may not collaterally attack them now, and they are subject to penalties for contempt if they have actual knowledge of the court's orders and violate them.[16] Any complaints the fishers may have concerning the state's representation of their interests are matters between them and the state. Indeed, much of the difficulty in this case is the direct result of the pressure these same fishers have brought to bear upon the state government.
 
 
 30
 The district court's injunction against state court action was both necessary and proper. The state trial court sought to require the Department of Fisheries to authorize a harvest of fish without regard to tribal rights or the district court's orders. This action went beyond the Washington Supreme Court's holding that the Department was without authority to obey the district court's orders; instead, it required a direct violation of them. The normal requirements for injunctive relief were clearly present. Washington's reliance on 28 U.S.C. § 2283, which limits injunctions of state court proceedings, is misplaced. Section 2283 does not apply when the United States requests the injunction. Leiter Minerals, Inc. v. United States, 352 U.S. 220, 224-26, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). Nor should the district court have waited for the state system to resolve questions of state law; none were relevant. As a party to this action, the state was bound not to interfere with the district court's enforcement of its decree, and any state law to the contrary would fall under the Supremacy Clause. U.S.Const. art. VI, cl. 2.
 
 VI Columbia River
 
 31
 A few issues concerning the Columbia River case deserve comment. The agreement reached by all the parties in early 1977 is a decree of the District Court of Oregon. No party has raised any questions in the district court concerning the State of Washington's authority to enter into the agreement and consent to the decree; the state is therefore bound by it. Under the principles discussed above, the fishers from both sides of the river, Oregon and Washington, are bound by the decree binding the states, and the district court had authority to hold violators with actual knowledge in contempt.
 
 
 32
 The district court's jurisdiction extends to the entire Columbia River, not simply to the Oregon side. Oregon Admission Act of February 14, 1859, § 1, 11 Stat. 383; The Annie M. Smull, 1 Fed.Cas. 983 (No. 423) (D.Or.1872). Nielsen v. Oregon, 212 U.S. 315, 29 S.Ct. 383, 53 L.Ed. 528 (1909), simply holds that Oregon may not enforce its regulatory laws on the Washington side. It does not question the power of the district court to enforce federal law over the entire river.
 
 VII Conclusion
 
 33
 We do not entertain the illusion that this is the last appeal we will see in this case. The issues involved are too volatile and raise too many emotions for a mere statement of the law to resolve them. On the other hand, neither this court nor the district court has any desire to be a permanent fish master in Washington waters. It is to be hoped that the parties can reach an agreement, as they did in the Oregon case, and that Washington law will be changed to allow the state to carry it out. Until the state decides to cooperate, the district court will have to continue protecting the tribes' rights. The state and the fishers hold the key to lifting federal judicial interference with their fish-management prerogatives.
 
 
 34
 In Nos. 77-3208 and 77-3129, the applications for writs of mandamus are dismissed.
 
 
 35
 In Nos. 77-3209, 77-3654, and 77-3655, the judgments are affirmed.
 
 
 36
 The cases are remanded so that the district courts may retain continuing jurisdiction.
 
 KENNEDY, Circuit Judge, concurring:
 
 37
 The dimensions of the state's resistance to the decrees in these cases are, in my view, over-stated by the opinion for the court, but I fully agree that by its policy with respect to this litigation the state has unduly complicated the issues without advancing its own cause. I agree further that an apportionment of fishing rights half to the treaty Indians and half to all other fishermen is binding on this panel. United States v. Washington, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). However, the court undertakes to restate the rationale for the apportionment rule of our earlier decision, and I find it necessary to suggest that the explanation of this critical point remains somewhat obscure.
 
 
 38
 The prior decision of this court and the opinion for the court on this appeal rely on an analogy to a cotenancy or to a "quasi-cotenancy" to rationalize the rule of even apportionment. The principles of a cotenancy apply to the legal relation among parties who share a right of possession in real or personal property.[1] But the parties to this dispute claim rights of access and exploitation in a wildlife resource of fluctuating and uncertain extent. These rights do not depend upon possession, or even upon ownership, of the wildlife itself. The cotenancy analogy would be of dubious relevance even in an era when the supply of fish exceeded the demands of the fishing population.[2] Certainly it is inadequate to resolve the present conflict between treaty rights and asserted state authority to conserve and allocate a fishery that cannot sustain the full demands of all the parties to this litigation. A cotenant, absent acts of waste or ouster, has the right to possess and use the entire property.[3] Accordingly, serious application of the analogy might permit a fishing group to take all the fish it has the capacity to catch, a result contrary to the one we affirmed in the principal case.[4]
 
 
 39
 Most importantly, the concept of a cotenancy does not help the court determine what share of the disputed rights should be allocated to each of the parties. By relying so heavily upon the theory, the court seems to imply that an even apportionment follows from creation of a cotenancy; but, of course, it does not. Cotenancy is not synonymous with entitlement to equal shares.[5] Nor does the right of a cotenant to partition provide guidance for an equitable division of the fish. Effective use of that remedy presupposes a method of determining the percentage interests of the parties, but that is precisely the question to be answered in the case.
 
 
 40
 By using the cotenancy theory to explain the critical ruling on apportionment, the court tends to mask the most difficult problems of this litigation: definition of the rights recognized by the treaties, reconciliation of those rights with the state's legitimate interest in conservation,[6] and declaration of the parameters of the state's authority to protect its interest by appropriate regulation. These are the issues that must be resolved if the district court is ever to return the task of supervising the fishery to the state.
 
 
 41
 Indian treaties are not second-class agreements, and rights declared by them may not be whittled down year by year as the state asserts a need to exercise its regulatory authority. The state and, absent its cooperation, the federal courts, must protect the fishing resource in a manner that respects the rights of the treaty parties. The boundaries of the state's authority and any rule of apportionment must therefore be drawn with precise reference to the treaty understandings. The district court undertook to explain those understandings in its original decision, and proper review of its ruling requires a like analysis. No doubt it would be correct to determine that the Indian tribes retained by treaty the right to fish for subsistence and ceremonial purposes and the right to a fair opportunity to compete in the recreational and commercial fisheries. But it has not been clearly demonstrated that the rule of fifty percent apportionment is a necessary and proper implementation of those treaty rights.
 
 
 42
 I recognize that the opinion of the court does not advocate strict adherence to the technical rules of common law cotenancy as a means of resolving this case. The defects of the analogy, however, should be noted specifically, since alternative justifications for the apportionment rule have not yet been fully discussed. This panel is bound by United States v. Washington, supra, and thus I concur in today's judgment. However, I would not attempt to restate or explain that decision by means of an inappropriate analogy. We do not sustain the dignity of the treaties in question by deriving an apportionment rule from a hesitant reference to property concepts that are unrelated to the rights asserted by the parties.
 
 WALLACE, Circuit Judge, concurring:
 
 43
 While I sympathetically agree with Judge Kennedy's statement that "it has not been clearly demonstrated that the rule of fifty percent apportionment is a necessary and proper implementation of (the Indians') treaty rights," I am compelled to join with Judge Goodwin based upon our prior decision in United States v. Washington, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).
 
 
 
 [1]
 This reservation included customary uses outside the area ceded. See Seufert Brothers Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919)
 
 
 [2]
 It is questionable whether Anglo-American concepts of sovereignty existed in these Indian cultures, or whether the collections of villages Governor Stephens made for purposes of his negotiations were in fact tribes. The United States treated them as tribes, however. The villages were then exercising and the tribes have since exercised what we would consider sovereign powers over their members and territories. These concepts have become basic to the legal justification for preserving the tribes as legal and cultural entities, a goal which the treaties were intended to serve and which Congress has recently reaffirmed. Indian Self-Determination Act of 1975, Pub.L. 93-638, Title I, 88 Stat. 2203, 2206. We will therefore use these concepts, recognizing that in doing so we may not be perfectly adapting Western legal concepts to Indian culture
 
 
 [3]
 We refer to the cotenancy analogy only because it is helpful in explaining the rights of the parties, not because all the rights and incidents of a common law cotenancy necessarily follow. The shared interest is in a yearly run which is apportioned on a yearly basis between two parties, each having equal rights in it. It is this equality of right between two quasi-sovereigns which we expressed by analogy in the earlier case. Obviously, not all the rules of cotenancy in land can apply to an interest of the nature of a profit. Another analogy might have been drawn to the doctrine of equitable apportionment between states claiming the yearly flow of a common stream. The Supreme Court has often resolved the conflicting claims of quasi-sovereign states in this context. Nebraska v. Wyoming, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945); Wyoming v. Colorado, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 (1922). Similar principles might apply here with the addition, of course, of the equality of rights which the treaties guarantee. The primary point is that the state and the tribes stand in similar positions as holders of quasi-sovereign rights in the fishery, and that the federal courts are, when necessary, the arbiters of those rights
 
 
 [4]
 Judge Burns pointed out this recalcitrance in his concurrence in United States v. Washington, 520 F.2d 676, 693 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976)
 
 
 [5]
 In those cases, and in Washington State Commercial Passenger Fishing Vessel Association v. Tollefson, 89 Wash.2d 276, 571 P.2d 1373 (1977), the court construed the treaties as simply guaranteeing tribal Indians equal treatment with other citizens and stated that the district court's actions had created a class based on an impermissible racial classification. We reject these positions for the reasons given above and in Justices Horowitz' and Utter's dissents. We assume that the Washington court has unwittingly misconstrued the basic concepts of Indian law and failed to understand a long line of Supreme Court decisions beginning with United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905)
 This misconstruction of Indian law was one basis for the Washington court's denial of state authority to allocate fish between treaty and nontreaty fishers. The state court thought that such an allocation would violate equal protection, something the state could not be required to do. We question whether the court would continue to deny state agencies the authority to allocate under a correct view of tribal status and rights.
 
 
 [6]
 The appellants argue that the district court attempted to transfer title in the fish to the tribes although fish in their wild state are incapable of being owned. This was not the district court's order. Considered in light of the record as a whole, the orders allocate only the opportunity to take fish. That allocation can best be expressed and enforced, of course, by numbers of fish taken
 
 
 [7]
 There is a small tribal ocean fishery, and the parties do not agree whether it is included in the tribal share. If it is not now included, we presume the district court would include it on a proper showing
 
 
 [8]
 The appellants do question the district court's limitation only of commercial fishing. Such a limitation may be the most practical way to enforce the district court's orders. The state can always propose limitations effective against both sport and commercial fishers if it can give reasonable assurances that such limitations would be enforceable. If the state were able and willing to regulate its fishery in a way consistent with the district court's orders, of course, the sport/commercial fishery issue would be entirely a state concern so long as tribal fishers had an opportunity to take their treaty shares
 
 
 [9]
 Appellants urge that the treaties are not self-executing but require Congressional action to be effective. The treaties specifically reserved rights to the tribes and gave federal guarantees of those rights; we do not know what more would be necessary to make the treaties effective and enforceable in federal court as the supreme law of the land. See United States v. Washington, 520 F.2d at 684
 
 
 [10]
 Other circuits have reached similar conclusions. In Monod v. Futura, Inc., 415 F.2d 1170 (10th Cir. 1969), the court in dictum stated that Rule 15(b) standards apply to a postjudgment amendment of a pretrial order if the issue has been tried without objection. The Sixth Circuit agrees, if the parties understood that the evidence was directed to the unpleaded issue. MBI Motor Company, Inc. v. Lotus/East, Inc., 506 F.2d 709 (6th Cir. 1974). The Fifth Circuit points out that in these circumstances allowing the amendment is mandatory. Wallin v. Fuller, 476 F.2d 1204 (5th Cir. 1973)
 
 
 [11]
 The fact that Gray's Harbor is outside the area ceded is irrelevant if Quinault Indians customarily fished there. Seufert Brothers Company v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919)
 
 
 [12]
 No one suggests a need for the trial court to go back and amend the pretrial order if we can say on appeal that it would have been justified in doing so. Dering v. Williams, 378 F.2d 417 (9th Cir. 1967). An appellate court may uphold a judgment on any theory which finds support on the record even though the lower court relied upon a wrong ground or gave a wrong reason. Jurinko v. Edwin L. Wiegand Company, 477 F.2d 1038 (3d Cir.), vacated on other grounds, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973)
 
 
 [13]
 The state's only objection to the specific allocations seems to be based on the equal protection argument which we rejected above. We thus have no occasion to decide whether the allocations were within the district court's discretion
 
 
 [14]
 Douglas v. Seacoast Products, Inc., 431 U.S. 265, 284-85, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), simply holds that a state does not have title to its fish to the extent that it can give its citizens rights superior to those of citizens of other states who hold a federal fishing license. This holding does not deny the state's substantial interest in fish or that its claim to them, as a sovereign, represents the claim of all its citizens. See Justice Rehnquist's opinion in Douglas, 431 U.S. at 287-88, 97 S.Ct. 1740
 
 
 [15]
 The United States and the tribes cite Wyoming v. Colorado and several other water law cases in their brief. We agree with them that this is the most nearly analogous area of the law. States litigate their quasi-sovereign rights to water, and appropriators under the states' laws are bound by those decisions without being parties. Nebraska v. Wyoming, 295 U.S. 40, 43, 55 S.Ct. 568, 79 L.Ed. 1289 (1935). Washington's fishers are its privies in litigation over the state's quasi-sovereign right to its fish in the same way that Wyoming's appropriators are its privies in litigation over the state's quasi-sovereign right to water
 
 
 [16]
 The appellants make a number of technical attacks on the injunctions. We find them to be without merit. In the context of all the proceedings in this case, the state and the fishers knew what was being enjoined. The use of a telephone hot line for daily information on fisheries openings and closings was appropriate and may have been the only practical way to get the information to all the fishers affected by the court's orders
 
 
 [1]
 "For indeed tenancies in common differ in nothing from sole estates but merely in the blending and unity of possession." 2 W. Blackstone, Commentaries * 180
 
 
 [2]
 The term "tenants in common" was used in an early case to describe the rights of state citizens to the ownership of New Jersey oyster beds. Corfield v. Coryell, 6 Fed.Cas. 546, 552 (C.C.E.D.Pa.1823). The phrase, however, was used solely to explain the court's holding that state citizens collectively held one hundred percent of the rights to the shellfish to the exclusion of noncitizens, rather than as a point of departure for explaining a method of division
 
 
 [3]
 2 American Law of Property § 6.13, at 52-53 (A. J. Casner ed. 1952); R. Powell & P. Rohan, Powell on Real Property P 603 (1 vol. ed. 1968); H. Tiffany, The Law of Real Property § 199 (3d ed. 1970)
 At common law, property rules pertaining to ouster and waste insured that cotenants shared finite resources fairly, but to apply those rules to effect an allocation of the parties' rights here would stretch an already attenuated analogy to the breaking point. Moreover, there is substantial doubt that the apportionment theory of this case follows from those rules.
 The standards which define waste for which a life tenant or tenant for years may recover are not necessarily applicable as between cotenants. The English rule is that, since a cotenant of a fee simple estate has the right to enjoy and use the common property in any reasonable way, the usual and ordinary use of the property by an owner in severalty is not waste. 2 American Law of Property, supra § 6.15, at 64; 2 W. Walsh, Commentaries on the Law of Real Property § 131, at 69 (1947). Thus, any cotenant may cut trees that are mature and fit for cutting, Martyn v. Knowllys, 101 Eng.Rep. 1313 (K.B.1799), and may develop and operate mining land, Job v. Potton, 20 Eq. 84 (1875), without liability for waste. In the United States, while it is clear that acts which amount to destructive permanent damage to the common property are held to constitute waste, E. Hopkins, Handbook on the Law of Real Property § 214, at 342 (1896); 2 W. Walsh, supra § 131, at 72, some cases have followed the English rule allowing the cutting and sale of timber, Hihn v. Peck, 18 Cal. 641 (1861); Buchanan v. Jencks, 38 R.I. 443, 96 A. 307 (1916); Williams v. Bruton, 133 S.C. 395, 131 S.E. 18 (1925); McDodrill v. Pardee & Curtin Lumber Co., 40 W.Va. 564, 21 S.E. 878 (1895), and the operation of mines, quarries, and oil wells, Prairie Oil & Gas Co. v. Allen, 2 F.2d 566 (8th Cir. 1924); Cascaden v. Dunbar, 191 F. 471 (9th Cir. 1911); McCord v. Oakland Quicksilver Mining Co., 64 Cal. 134, 27 P. 863 (1883); Payne v. Callahan, 37 Cal.App.2d 503, 99 P.2d 1050 (1940), while others have held that the cutting and sale of timber, Fitzhugh v. Norwood, 153 Ark. 412, 241 S.W. 8 (1922); Emmons v. Evans, 178 Ky. 180, 198 S.W. 900 (1917), or the development or operation of mines or oil wells, Clark v. Whitfield, 218 Ala. 593, 119 So. 631 (1929); Abbey v. Wheeler, 170 N.Y. 122, 62 N.E. 1074 (1902); McNeely v. South Penn Oil Co., 58 W.Va. 438, 52 S.E. 480 (1905), constitutes waste. In cases following the latter rule, courts have tended to call the action one for waste but to hold the defendant merely to a duty to account for the net proceeds from the operations rather than to impose the usual penalties, such as treble damages, for waste. See generally cases cited above and 2 American Law of Property, supra § 6.15; 2 W. Walsh, supra § 131.
 Injunctive relief in an action for waste by one cotenant against another is granted only for waste which is "of a malicious character, or so unusual or unreasonable as to constitute a wanton destruction of the estate." Mott v. Underwood, 148 N.Y. 463, 42 N.E. 1048, 1050 (1896); see McCord v. Oakland Quicksilver Mining Co., 64 Cal. 134, 27 P. 863 (1883); R. Powell & P. Rohan, supra P 647, at 695.
 With reference to ouster, a tenant who excludes his cotenants from the commonly held property by adverse possession is guilty of an ouster, and an action in ejectment may be brought by a dispossessed tenant. J. Cribbet, Principles of the Law of Property 104 (2d ed. 1975). "(T)he ousting tenant's possession must be exclusive, for mere possession and use of the entire property by one cotenant is not an ouster, nor is his possession adverse, so long as the other cotenants remain voluntarily out of possession, and are not kept out of possession by the acts of the possessor-tenant." 2 American Law of Property, supra § 6.13, at 52-54 (footnotes omitted).
 
 
 [4]
 While courts will not interfere by way of injunction with cotenants' exercise of their rights to use and enjoyment of the cotenancy even when one cotenant has committed waste, see note 3 supra, an action for accounting for rents and profits between cotenants may be available when one cotenant has taken certain advantages from the property. Even when a cotenant's use does not constitute waste or ouster, he is required to account to his cotenants for their proportionate share of the net amount received from the cutting and selling of timber or the operation of mines or oil wells. Prairie Oil & Gas Co. v. Allen, 2 F.2d 566 (8th Cir. 1924) (oil); Cascaden v. Dunbar, 191 F. 471 (9th Cir. 1911) (gold mining); Buchanan v. Jencks, 38 R.I. 443, 96 A. 307 (1916) (timber); see Martyn v. Knowllys, 101 Eng.Rep. 1313 (K.B.1799). However, a cotenant is not required to account for crops grown and harvested by him. 2 American Law of Property, supra note 3, § 6.14, at 60; see, e. g., Black v. Black, 91 Cal.App.2d 328, 204 P.2d 950 (1949); Le Barron v. Babcock, 122 N.Y. 153, 25 N.E. 253 (1890). The distinction seems to be that a cotenant need not account for profits from a use of the cotenancy which does not reduce the permanent value of the property. Cf. 3 B. Witkin, Summary of California Law § 216, at 1948 (8th ed. 1973), suggesting that because of the possibility of exhausting the resources, the rule of accounting is a special rule applying only to oil and mineral rights. In Mott v. Underwood, 148 N.Y. 463, 42 N.E. 1048 (1896), the court assumed that a cotenant who planted oysters in a commonly held oyster bed could prevent his cotenants from interfering with the crop, though no cotenant could maintain an action for trespass or conversion against his cotenant for taking natural oysters from the land held in common. That case suggests that oysters, at least, might be treated in a manner similar to crops for purposes of an accounting. To the extent that a run of anadromous fish is capable of self-perpetuation, that is, up to the point where fishing activity reduces the quantity of fish in future runs, perhaps each cotenant should be allowed to take free from a duty to account
 Another factor in the equitable equation is that the State of Washington operates salmon hatcheries. In an action for an accounting, a cotenant who makes improvements on the property generally may not claim a credit for such expenditures. 2 American Law of Property, supra note 3, § 6.18, at 81. In an action for partition, however, a cotenant who has made an improvement is awarded any additional amount which the property might bring as a result of the improvement. Id. at 83; IV S. Symons, Pomeroy's Equity Jurisprudence § 1389, at 1018 (5th ed. 1941). Apparently neither the district court nor this court has considered whether the state's operation of hatcheries should have an effect on apportionment of the fish. Cf. Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (Puyallup II ) (reserving the question of whether the catch of steelhead that was developed from the state hatchery program could be taken into consideration in allocating the yearly catch between treaty Indians and sport fishermen).
 Again, the cotenancy analogy, if taken seriously with reference to the rule of even apportionment, creates more problems than it solves.
 
 
 [5]
 Each tenant in common may have a share greater or smaller than the shares of the others. 2 American Law of Property, supra note 3, § 6.5, at 19. If the shares are not fixed in the instrument creating the cotenancy it may be presumed that the cotenants take in equal shares, but an intent that they hold different fractional shares may be established by the circumstances. Id. at 19-20; E. Hopkins, supra note 3, § 209, at 336
 
 
 [6]
 See Puyallup Tribe v. Department of Game, 391 U.S. 392, 398, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (Puyallup I )